[Crim. No. 31753. Second Dist., Div. Three. June 29, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAUDELLE GRAHAM, JR., Defendant and Appellant.

738

---

COUNSEL

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr. and Vincent J. O'Neill, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**COBEY, Acting P. J.**—Defendant, Claudelle Graham, Jr., appeals from a judgment of conviction of assault with a deadly weapon (Pen. Code,

§ 245, subd. (a)) that included the penalty enhancing finding that Graham used a firearm in the commission of the offense. (Pen. Code, § 12022.5.) The appeal lies. (Pen. Code, § 1237, subd. 1.)

Graham contends that the trial court committed error by: (1) allowing the People to introduce cumulative rebuttal evidence; (2) instructing the jury with regard to the limited admissibility of evidence tending to show his commission of other crimes; and (3) instructing the jury regarding the definition of an accomplice and the requirement that the testimony of an accomplice be viewed with distrust.

We have examined these contentions and hold that none constitutes reversible error. Therefore we will affirm the judgment of the trial court with a slight modification discussed at the end of the opinion.

## FACTS[1]

In the early morning hours of February 6, 1977, the victim, Robert James, became involved in an altercation with Cynthia Richardson regarding a picture she took from his apartment during a visit. Shortly thereafter James received a telephone call at a neighbor's apartment from a male who threatened him and said that "he was coming over."

James then went with a friend to a club for a short time. Upon his return he discovered that a window in his apartment had been broken. After determining that nothing was missing from his apartment and that no one was in the apartment, he put on a pistol and holster for protection and again departed.

When he got to the front entrance of his apartment complex he found that the door had been chained and locked closed. Therefore he decided to exit through a stairway that led to the garage attached to the apartment.

As James was walking through the garage he heard a voice. Someone was "talking crazy, talking loud about what he was going to do. He was going to kill me, shoot me. He couldn't make up his mind."

James turned and saw a man, identified as defendant Graham, standing in the doorway of a Volkswagen. Graham held a rifle in his

---

[1]We state the facts in the light most favorable to the People as the prevailing party below. (*People* v. *Henderson* (1977) 19 Cal.3d 86, 97 [137 Cal.Rptr. 1, 560 P.2d 1180].)

hands. Graham pointed the gun at James and walked over to him. He continued to tell James that he could not decide whether to shoot him.

This conversation at gunpoint lasted between 20 and 25 minutes. Finally, James said that he had to leave. Graham responded by striking him on the head with the butt of the rifle. The blow knocked James to the ground and caused James' gun to fall upon the ground.

Graham picked up the gun and told James that he was going to take the gun and give it to his girl friend. James then saw the aforementioned Cynthia Richardson sitting in the Volkswagen. Meanwhile, Graham slowly backed up so that he was again in the doorway of the Volkswagen.

James was angry that Graham had taken his gun. He kept talking to Graham and managed to get close enough to be able to reach out and grab Graham. James then pushed on the Volkswagen door in an effort to get the gun from Graham. He managed to trap Graham between the body of the car and the door but he was unable to disarm him. Therefore, he tried to run away.

As he ran, he was shot three times. The shots knocked him down and as he lay on the ground he heard the Volkswagen start up. James was able to determine after a few minutes that Graham and Richardson had departed.

## DISCUSSION

1.    *The Admission of Rebuttal Evidence Was Not Error*

The People sought to establish during their case in chief that, as noted above, James was shot by Graham while fleeing after failing to disarm Graham. The People introduced evidence on this issue in the form of the eyewitness testimony of James and Richardson, as well as the testimony of Roger De Jorlando, a police investigator.

De Jorlando gave expert testimony[2] that a rifle of the type which fired the shots that injured James leaves a residue of powder, called "tattooing," around the bullet entry hole when fired from a distance of 40 inches

---

[2]Richardson testified at trial that James was accidentally shot during a scuffle to gain possession of the rifle rather than while fleeing. De Jorlando's testimony was in part directed to impeaching Richardson's testimony by recall of a prior inconsistent statement. De Jorlando testified that shortly after the shooting Richardson had told him, "[James]

or less. He testified that he found no tattooing on the jacket worn by James. From this he concluded that James was more than 40 inches from the muzzle of Graham's rifle when he was shot.

Whether James was shot while fleeing or accidentally shot during a scuffle over possession of the rifle became the crucial factual issue submitted to the jury. Graham attacked the evidence introduced by the People by testifying to the contrary that James "grabbed the barrel of the gun," pulled it "five, six inches," and "the gun went off."

The trial court then allowed the People to introduce, over Graham's objection, the challenged rebuttal evidence. De Jorlando was again called to the stand. He was then asked if in his opinion it would be possible for the bullet holes in James' jacket to have been made from a distance of approximately 10 inches. He answered in the negative because of the lack of tattooing.

Graham contends that De Jorlando's testimony conveyed no new matter to the jury and had the effect of erroneously magnifying the significance of the evidence. Ironically, his contention suggests a rule that is the converse of the rationale that is the basis for restricting rebuttal evidence. ■■■ Restrictions on the introduction of rebuttal evidence were created to prevent the tactic of *withholding* crucial evidence from presentation during the case in chief in order to take advantage of the drama and surprise inherent in confronting the defendant with that evidence *for the first time* at the end of trial. (*People* v. *Carter* (1957) 48 Cal.2d 737, 753 [312 P.2d 665]; *People* v. *Contreras* (1964) 226 Cal.App.2d 700, 702 [38 Cal.Rptr. 338].)

We decline to extend the rule as suggested by Graham. ■■ The admission of rebuttal evidence rests largely within the discretion of the court and will not be disturbed upon appeal in the absence of palpable abuse. (Pen. Code, § 1093, subd. 4; *People* v. *Demond* (1976) 59 Cal.App.3d 574, 587 [130 Cal.Rptr. 590].) ■■ Numerous cases have approved the introduction of rebuttal evidence where, as in the case at bench, rebuttal testimony repeats or fortifies a part of the prosecution's case in chief which has been attacked by defense evidence. (*People* v. *Whitehorn* (1963) 60 Cal.2d 256, 263 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Demond, supra,* 59 Cal.App.3d at pp. 580-581, 587; *People* v. *Orabuena* (1976) 56 Cal.App.3d 540, 543-544 [128 Cal.Rptr. 474].)

---

kept pushing the car door closed so [Graham] would be—couldn't get in, talking about he wanted his gun, so he pushed [Graham] too far and [Graham] just shot him."

## 2. The Instruction on the Limited Admissibility of Evidence of Other Crimes Was Proper

Graham contends that the trial court erred in reading the jury an instruction[3] based on CALJIC No. 2.50, the standard instruction regarding the limited admissibility of evidence tending to show that a defendant has committed crimes other than that for which he or she is on trial. We disagree. ■ A basis for the instruction existed in the evidence presented to the jury (see *People* v. *Nudd* (1974) 12 Cal.3d 204, 209 [115 Cal.Rptr. 372, 524 P.2d 844], overruled on other grounds 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Harris* (1977) 71 Cal.App.3d 959, 965-966 [139 Cal.Rptr. 778]) and the instruction aided the jury's understanding of the case by explaining to the jury the limited significance of such evidence. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

Graham testified on direct examination that he purchased the rifle with which James was shot from a private party rather than a gun store, he fired the gun in the backyard of a friend's house on New Year's eve, he thereby learned that it was an automatic weapon, and he had the gun with him in the back of the Volkswagen on the night of the shooting. This testimony *tends to show* Graham's commission of several offenses: (1) possession of an automatic weapon (Pen. Code, §§ 12200, 12220); (2) transportation of an automatic weapon (Pen. Code, §§ 12200, 12220); and (3) disturbing the peace (Pen. Code, § 415, subd. (2)).[4]

## 3. The Instructions Defining an Accomplice and Indicating the Untrustworthiness of Accomplice Testimony Did Not Constitute Reversible Error

Graham contends that the evidence at trial did not justify using the standard instructions defining an accomplice (CALJIC No. 3.10 (1976 rev.)), and indicating that the testimony of an accomplice should be viewed with distrust (CALJIC No. 3.18). ■ We believe that ordinari-

[3]The instruction was given at the People's request without objection from Graham. We note that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." (*Henderson* v. *Kibbe* (1977) 431 U.S. 145, 154 [52 L.Ed.2d 203, 212, 97 S.Ct. 1730].)

[4]Additionally, we note that during cross-examination Graham was asked if he knew that possession of an automatic weapon was illegal. An objection to this question was sustained and the question was subsequently stricken. (See *People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 885 [136 Cal.Rptr. 429]; *People* v. *Williams* (1970) 11 Cal.App.3d 970, 976-978 [90 Cal.Rptr. 292].)

ly the evidence of Richardson's complicity would warrant the giving of these instructions[5] (see *People* v. *Gordon* (1973) 10 Cal.3d 460, 466-469 [110 Cal.Rptr. 906, 516 P.2d 298]), but that, under the circumstances of this case, the giving of them was error. This is because the sole witness to whom such instructions might apply (Richardson) testified *in favor of the defendant.*

The practice of instructing the jury to be skeptical of accomplice testimony developed in order to make the admission of such testimony against a criminal defendant fair. (*Phelps* v. *United States* (5th Cir. 1958) 252 F.2d 49, 52; *People* v. *Coffey* (1911) 161 Cal. 433, 437-438 [119 P. 901].) For experience has shown that an accomplice will often attempt to earn clemency or leniency by giving testimony unfavorable to the defendant. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 967 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Gordon, supra,* 10 Cal.3d at pp. 468-469; 7 Wigmore on Evidence (3d ed. 1940) § 2057, p. 322.)

But, where an accomplice gives testimony favorable to the defendant many jurisdictions have held such an instruction to be improper. (*People* v. *Brown* (1977) 55 Ill.App.3d 724 [370 N.E.2d 814, 816-817]; *People* v. *Howard* (1970) 130 Ill.App.2d 496 [263 N.E.2d 633, 634-635]; *People* v. *Hall* (1977) 77 Mich.App. 456 [258 N.W.2d 517, 520-521]; *Wheelis* v. *State* (Fla.App. 1976) 340 So.2d 950, 952; *State* v. *Anderson* (1968) 104 N.J.Super. 18 [248 A.2d 438, 439]; *State* v. *Reeder* (Mo. 1965) 395 S.W.2d 209, 210-211; *Hazzard* v. *State* (1929) 111 Tex.Crim. 539 [15 S.W.2d 638, 639].) There is no basis then for the suspicion that the testimony was given in an attempt to obtain leniency. As Wigmore said, "The essential element . . . is this supposed . . . expectation of conditional clemency. If that is lacking the whole basis for distrust fails." (7 Wigmore on Evidence (3d ed. 1940) § 2057, p. 322.)

Similarly, the courts of this state have repeatedly held it to be error to instruct the jury that the testimony of an accomplice should be viewed with distrust where the accomplice testifies *for* the defendant. (*People* v. *O'Brien* (1892) 96 Cal. 171, 180-181 [31 P. 45]; *People* v. *Hartung* (1950) 101 Cal.App.2d 292, 295 [225 P.2d 614]; *People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 607 [84 Cal.Rptr. 863].) While these cases all deal with trials in which the accomplice was called as a witness on behalf of the

[5]The instructions were given at the request of the People without objection from Graham. Graham's failure to object to the giving of these instructions, however, does not deprive him of the right to challenge their propriety on appeal. (Pen. Code, §§ 1259, 1469; *People* v. *Graham* (1969) 71 Cal.2d 303, 318-319 [78 Cal.Rptr. 217, 455 P.2d 153].)

defendant, we believe that it is equally erroneous to give such instructions in a situation where the witness was called by the People but testified in favor of the defendant. We can see no meaningful distinction between the two situations. (See *People* v. *Wolden* (1967) 255 Cal.App.2d 798, 805 [63 Cal.Rptr. 467].)[6]

As already noted, in the case at bench Richardson was the only witness to whom these instructions could have been applicable. Though called as a witness by the People, her testimony was favorable to Graham. As we have already pointed out, the crucial factual issue in this case was whether James was shot while fleeing as asserted by the People or during a struggle for the rifle as asserted by Graham. Richardson's testimony regarding the shooting incident was that: (1) Graham hit James with the butt of the rifle because James made a motion as if he were going for his pistol; (2) Graham and she were attempting to leave in the Volkswagen but James prevented Graham from entering the car by repeatedly slamming the door; and (3) the rifle went off when James grabbed and pulled on the barrel of the gun.

Therefore instructing the jury on the definition of an accomplice and to view accomplice testimony with distrust was error. Yet these instructions do not constitute reversible error. It appears both from the nature of the

---

[6]In so holding, we note our awareness of the considerations to the contrary raised by the Fifth Circuit in *United States* v. *Nolte* (5th Cir. 1971) 440 F.2d 1124, 1126. In fact we agree with that court's suggestion that accomplices *may* agree to give testimony that will falsely exonerate each other. (*Ibid.*) We disagree, however, with the conclusion there expressed, though, that the existence of this possibility justifies instructing the jury to distrust the testimony of an accomplice whether the accomplice testifies for the prosecution or for the defense.

The harsh nature of an instruction *compelling* the jury to view an accomplice's testimony with distrust has been recently noted by our Supreme Court. (*People* v. *Tewksbury, supra,* 15 Cal.3d at p. 967.) While no witness is entitled to "a false aura of veracity" (*People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1]), there is a less prejudicial means of impeaching the testimony of an accomplice testifying in favor of a defendant. (Cf. *People* v. *Rist* (1976) 16 Cal.3d 211, 220 [127 Cal.Rptr. 457, 545 P.2d 833].) The standard instruction (CALJIC No. 2.20) on witness credibility is routinely read to all juries. It was given in the case at bench. It instructs the jury to consider, among other things, the existence of "bias, interest, or other motive" in considering the credibility of a witness. (See also Evid. Code, § 780.) Possible accomplice status may be properly *argued* to the jury as providing either a basis for inference of bias or as suggesting an improper motive for a witness' testimony. (See *People* v. *Hardy* (1969) 271 Cal.App.2d 322, 330 [76 Cal.Rptr. 557].) Accordingly, there is no need for a trial court overly emphasizing to the jury the possibility of the existence of either bias or improper motive by instructing the jury to distrust the testimony of a possible accomplice witness where that witness testifies for the defense. The giving of CALJIC No. 2.20 sufficiently covers the matter in such circumstances.

instructions and the tenor of the evidence that the same result would have been reached in the absence of this error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243].)

The prejudicial effect of the error was considerably softened by the nature of the accomplice instructions given. The jury was not instructed that Richardson was an accomplice as a matter of law. Instead the trial court instructed the jury on how to determine when a person is an accomplice and left it up to the jury to make that determination. In view of the jury's general verdict, we do not know whether or not the jury found Richardson to be an accomplice and her testimony to be consequently distrusted. If the jury failed to find Richardson to be an accomplice, the accomplice instruction had *no* prejudicial effect whatsoever. Also, the erroneous instructions were given in conjunction with additional accomplice instructions relating to corroboration: (1) the standard instruction that the testimony of an accomplice must be corroborated by other evidence in order to justify a conviction (CALJIC No. 3.11); (2) the standard instruction that corroborative evidence is evidence which tends to connect the defendant with the commission of the offense (CALJIC No. 3.12); and (3) the standard instruction on the inability of accomplices to corroborate each other's testimony (CALJIC No. 3.13). These instructions, although requested by the People, are really largely defense-oriented and tend to provide a defense coloration to the entire group of accomplice instructions.

Finally, and most importantly, the evidence against Graham was overwhelming. As noted previously, Richardson was impeached not only by her prior statement that Graham had shot James, but by the testimony of a firearms expert that James could not possibly have been shot from close range.

## MODIFICATION

In the oral pronouncement of sentence the trial court directed that Graham be "sentenced to the state prison for the term prescribed by law." Under the form of written judgment then in use, however, Graham was sentenced to imprisonment in the California Institution for Men at Chino. Since a trial court does not have jurisdiction to specify detention in a particular institution, this is obviously a clerical error which we will correct. (See *People* v. *Thomas* (1976) 65 Cal.App.3d 854, 858 [135 Cal.Rptr. 644].)

## DISPOSITION

The judgment is modified to provide that Graham is sentenced to state prison for the term prescribed by law. As so modified, the judgment is affirmed.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied July 26, 1978, and appellant's petition for a hearing by the Supreme Court was denied August 31, 1978. Mosk, J., was of the opinion that the petition should be granted.