[No. B063577. Second Dist., Div. Seven. May 11, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE WALTER FRANCO, Defendant and Appellant.

COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and Mitchell Keiter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WOODS (Fred), J.—Convicted by jury of first degree murder (Pen. Code,[1] §§ 187, 12022, subd. (a)(1)) and sentenced to state prison for 26 years to life, appellant contends prosecutorial misconduct, instructional errors, and an abuse of sentencing discretion require a reversal of the judgment. We find no error and affirm.

PROCEDURAL BACKGROUND

Jose Walter Franco (appellant), George Farias, and Augustine Gallardo were charged with the October 15, 1989, murder of Luis Arevalo. It was alleged that Gallardo used a firearm, a .22-caliber rifle, in the commission of the murder (§ 12022.5) and the codefendants were principals in its use (§ 12022, subd. (a)(1)).

Prior to trial, on September 6, 1990, Farias pleaded guilty to voluntary manslaughter. Trial of appellant and Gallardo began November 19, 1990, but on November 29, still during jury selection, the proceedings were continued to December 10. On December 10, Gallardo pleaded guilty to second degree murder. The trial of appellant resumed but on December 13, 1990, was continued until January 14, 1991. There were other trial interruptions. Testimony concluded February 13, 1991, jury instruction began February 19, and jury deliberation commenced February 21. On February 28, 1991, the jury found appellant guilty of first degree murder and found true the firearm allegation (§ 12022, subd. (a)(1)). On June 11, 1991, appellant's new trial motion was denied and he was referred to the Youth Authority for evaluation (Welf. & Inst. Code, § 707.2). On September 22, 1991, appellant was sentenced to a 26-years-to-life state prison term, to be housed at the Youth Authority. (Welf. & Inst. Code, § 1731.5, subd. (c)). This appeal followed.

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

### Factual Background

There being no insufficiency of evidence claim, we summarize the evidence. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

In 1989 two East Los Angeles gangs, the 39th Street Gang and the 36th Street Gang, had a history of animosity. Their claimed territories were adjacent and their members knew each other. Both gangs marked their turf by writing their gang name and members' names on walls.

Luis Arevalo (the victim), called "Dreamer," was 14 years old and a member of 36th. Appellant, 17 years old, was a member of 39th. Appellant had associated with members of 39th for years and when he was 15 years old became a member. He didn't get along with any members of 36th.

The victim, like many gang members, had his name (Dreamer) on walls in 36th territory. About three months before his death someone circled his name. This signified he was going to be killed.

About a month before the victim's death, appellant met a 36th gang member, Droopy, at a party. The next day Droopy telephoned appellant and proposed a peace treaty between the two gangs. Appellant informed senior 39th members who called a meeting and agreed to the peace treaty. According to the treaty, the gangs were not to disrespect each other and were to avoid each others' territory.

Within a month the treaty was broken. Thirty-sixth members beat up a 39th member, Little Bird, and showed disrespect by crossing out his name. Appellant telephoned Droopy and informed him all members of 39th were mad because of these incidents.

Several occurrences caused appellant to dislike Dreamer. At a party, Dreamer had bumped into appellant's shoulder. After that, at school, Dreamer had told appellant's younger sister, Claudia, that "they couldn't catch [appellant] . . . [and] that he was going to fuck her up. . . ." Dreamer then pushed her. Then about two days before Dreamer was killed, a 36th member bumped Claudia and spit on her.

On Saturday, October 14, 1989, 39th members attended a party at 39th Street and Grand. Adults, nongang members, were having the party inside but had invited 39th members who congregated outside by the street. Bird, a 39th member, told other 39th members he had heard 36th was going to do a

"drive-by"[2] at the party. In the early evening, two 36th members, Rascal and Gizmo, arrived and were ordered by Bird, who had a rifle, to leave.

About 10 p.m. appellant, Gallardo (a 39th member), and Farias, Gallardo's cousin who lived in San Bernardino, arrived at the party. They arrived in Gallardo's parents' station wagon, which Farias drove. Bird told them about the Rascal-Gizmo intrusion.

Bird, who lived in the "party" building, went inside, returned with a .22-caliber semiautomatic rifle with a sawed-off stock, and showed it to the others. Gallardo took possession of the rifle. Appellant, Gallardo, and Bird said "Let's go do a drive-by." The three of them, with Farias driving, drove into 36th territory.

At 36th Street and Maple, Osvaldo Miranda, a 36th member, was walking with his mother and aunts when a station wagon slowed beside him. The front passenger (Gallardo) who had something in his hands, said "39th Street." Miranda thought he was going to be shot. The station wagon drove on. Gallardo didn't shoot Miranda "because [he] was walking with grown ladies."

Appellant, Gallardo, Bird, and Farias returned to the party. About 15 minutes later a car drove by with the front passenger leaning out the window "throwing" gang signs.[3] Appellant "screamed 'That's Dreamer, that's Dreamer.'"

Appellant and the others didn't pursue Dreamer because a police car appeared.

Sometime after midnight, October 15, appellant, Gallardo, and Farias left the party. Gallardo, with the rifle, sat in the rear because that window opened more readily. Farias drove and appellant sat in front. As they approached 40th Place appellant told Farias to turn. Appellant knew Dreamer lived on 40th Place and hoped to see him, to "surprise" him.

Midblock, appellant saw someone walking toward their car and as they passed him appellant yelled, "That's Dreamer." Farias stopped the car. Gallardo, head first, holding the rifle, crawled half out the window, sat on the sill, and over the roof pointed the rifle at the victim, said "Fuck 36th," pulled the trigger, noticed the safety was on, released it, fired, hit the victim in the leg, saw the victim fall holding his leg and trying to cover himself, and

---

[2] I.e., while passing by in a car, shoot at 39th members.
[3] Gerardo Zambrano testified throwing gang signs constitutes a challenge.

continued firing the remaining seven or eight rounds. Two were fatal: one to the chest, another to the head.

When Farias sped from the scene, appellant told him to slow down otherwise they'd attract police attention. They went to Gallardo's house where Gallardo removed the clip and put the rifle under his bed. He handed the clip and bullets to appellant who reloaded the clip. Appellant went home. Later, about noon, appellant told a fellow 39th member (Gerardo Zambrano) "they" had killed Dreamer.

The rifle, which Gallardo sold, was not recovered.

The police arrested appellant, Gallardo, and Farias. Each gave tape-recorded statements and signed statement summaries.

## DISCUSSION

1. *Appellant contends prosecutorial misconduct denied him a fair trial.*

■ Appellant asserts prosecutorial misconduct first occurred during juror voir dire when the prosecutor stated: "I think we can all pretty much admit that there is a tremendous gang problem in Los Angeles County, there is a lot of violence. [¶] There is not a day that goes by that you don't open up the Metro Section and read about some senseless drive-by shooting."

Defense counsel objected to this statement and the trial court admonished the jury that this was not what appellant was charged with.

Although we do not commend the remark, we cannot, in context, condemn it as misconduct.

A jury questionnaire had asked numerous questions concerning gangs: whether prospective jurors were familiar with them, knew members, had themselves belonged, etc. And defense counsel, *before* the prosecutor made the subject remark, had commented about publicized shootings and killings of innocent people, had stated "all . . . of us have heard a lot of publicity about shootings, drive-bys . . . gangs," had referred to a "gang type situation," and represented that appellant may be a member of a gang.

The subject remark largely repeated defense counsel comments and stated what is common knowledge. Moreover, any potential prejudice was cured by the trial court's admonition.

■ Appellant argues prosecutorial misconduct next occurred, also during jury voir dire, when the prosecutor reacted to a prospective juror's

statement that she knew an Officer Ken Bell. The prosecutor stated "It's a small world" because "I work with the District Attorney's Hardcore Gang Division" and have contact with Officer Bell. The prosecutor indicated it was possible Officer Bell could be a witness and questioned the juror about whether, in that event, she could be impartial in assessing his credibility. The prospective juror was later excused.

Although inappropriate, this unelaborated reference to the hardcore gang division did not deprive appellant of a fair trial. The comment was addressed to a prospective juror who did not sit on the jury, was made months before jury deliberations began, was neither repeated nor elaborated upon, was not inflammatory and if not common knowledge (that such specialized units exist), was hardly startling.

■  Finally, appellant contends prosecutorial misconduct occurred during jury argument when the prosecutor referred to appellant as a "hard-core experienced sophisticated gang member." We disagree.

As to appellant *being* a gang member, not only did prosecution witnesses so testify but appellant, during his testimony, stated he had been a member of the 39th Street Gang for one and a half years and had associated with its members for years before that. He further testified to helping negotiate a peace treaty on behalf of his gang, being willing to "back up" members of his gang, disliking all members of a rival gang, frequently going target shooting with other gang members, and calmly telling Farias to slow down after the victim had been shot.

For a prosecutor, during argument, to characterize such a gang member as "hard-core," "experienced," and "sophisticated" did not exceed the bounds of vigorous and fair argument. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [the prosecutor referred to the defendant as a "contract killer," "a snake in the jungle," "slick," "tricky," a "pathological liar," and "one of the greatest liars in the history of Fresno County"].)

*2.  Appellant contends the trial court erred in giving an unmodified accomplice instruction (CALJIC No. 3.18).*

Because the prosecutor called Gallardo as a witness and the defense called Farias, the trial court gave a series of accomplice instructions to the jury. (CALJIC Nos. 3.10 [Accomplice—Defined], 3.11 [Testimony of Accomplice Must Be Corroborated], 3.12 [Sufficiency Of Evidence To Corroborate An Accomplice], 3.13 [One Accomplice May Not Corroborate Another],

3.16 [Witness Accomplice As A Matter Of Law], and 3.18 [Testimony Of Accomplice To Be Viewed With Distrust].)

Appellant faults only one accomplice instruction, CALJIC No. 3.18, which reads: "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

Appellant does *not* argue that the trial court should have entirely omitted CALJIC No. 3.18. He apparently concedes that because the prosecutor called Gallardo, an accomplice as a matter of law, who, in part, gave damaging testimony against appellant, the trial court had a sua sponte duty to give No. 3.18. (*People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485].)

■ Instead, appellant, who did not object to the trial court's giving CALJIC No. 3.18, argues the trial court had a sua sponte duty to modify No. 3.18 as follows: "The testimony of an accomplice *which tends to incriminate the defendant* ought to be viewed with distrust." Appellant relies on *People* v. *Flanders* (1979) 89 Cal.App.3d 634 [152 Cal.Rptr. 696] and *People* v. *Graham* (1978) 83 Cal.App.3d 736 [149 Cal.Rptr. 6]. Neither supports appellant's contention.

In *Flanders* the defendant was charged with robbing a victim of his wallet and assaulting him. The prosecution called defendant's confederate, Anderson, who had pleaded guilty to assaulting the victim. Anderson gave both favorable testimony (only he, not defendant, assaulted the victim) and unfavorable testimony (*he* didn't take the victim's wallet *and* defendant was present during the assault). The defense was alibi.

The trial court, without objection by defendant, gave modified accomplice instructions (the testimony of an accomplice *which tends to incriminate* the defendant should be viewed with distrust). Despite the modification, defendant claimed the accomplice instructions were error. In rejecting this contention *Flanders* stated: "The testimony and prior statement of the accomplice had two natures, one incriminating (which appellant would like to be viewed with distrust), and one exonerating (which appellant would like the jury to believe). If appellant believed that additional instructions were necessary to separate or clarify the jury's duties with regard to these two aspects, he was required to make known his views to the trial court. From appellant's failure to object or request other instructions, we can only conclude he felt that in

this respect the instruction given, which limited the view with distrust to that portion of the testimony or prior statement 'which tends to incriminate the defendant,' was acceptable to him. In this type of situation, he may not now urge that it was inadequate." (*People* v. *Flanders*, *supra*, 89 Cal.App.3d at p. 640.)

In *People* v. *Graham*, *supra*, 83 Cal.App.3d 736, although the prosecutor called an accomplice, her testimony was entirely favorable to the defendant. She testified, consistent with the defense, that the victim was shot during a struggle for the rifle, not while fleeing, as the prosecution urged. In such circumstances it was error, *Graham* held, to instruct the jury they must view the accomplice testimony with distrust. (*Id.* at p. 744.) But the error was found harmless (*ibid.*) and *Graham* observed, in connection with another instruction, "We note that '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " (*Id.* at p. 742, fn. 3.)

Unlike *Graham*, the testimony (*and* prior statements) of Gallardo and Farias were partly favorable and partly unfavorable to appellant.

Apposite is *People* v. *Miller* (1960) 185 Cal.App.2d 59 [8 Cal.Rptr. 91] where the prosecutor called an accomplice and then the defendant called the same accomplice. The trial court gave the "view with distrust" instruction without objection by defendant. On appeal, defendant claimed error. *Miller* rejected the claim, stating: "[T]o permit the defendant in this case to claim error in the giving of the instruction under consideration would pervert the purposes of justice. Under the authorities heretofore noted and the circumstances of this case, a failure to give that instruction would have been error. It was given for the benefit and protection of the defendant. If this benefit was outweighed by a disadvantage attributable to the fact that the witness was called by him, as well as by the People, he should have informed the trial court of his wishes in the premises, i.e., whether to accept or reject the instruction. If the allegedly objectionable instruction had not been given, it is more than likely that the defendant would now be complaining because of such failure. He may not sit silently during the course of his trial; create a situation which may be to his advantage or disadvantage and require the court to make an election on his behalf without being bound by that election. He must make his own election and advise the court thereof by requesting an instruction acceptable to him, or in some other appropriate manner. To proceed otherwise is to require the court to choose one of two alleged evils and reserve to the defendant the right to claim error irrespective of the choice made. This does not comport with justice. Analogous applicable principles of law are found in the rules which foreclose a consideration of

invited error . . . ; require a party to make his election of remedies. . . ; or support a waiver or estoppel based on conduct." (*Id.* at pp. 83-84, citations omitted.)

The Supreme Court recently approved this statement in *Miller* observing: "A comparable situation exists when an alleged accomplice testifies as a prosecution witness and then again as a defense witness, giving testimony favorable to both the prosecution and the defense, so that an instruction to view the witness's testimony with caution could be either beneficial or harmful to the defendant. In such cases, contrary to the general rule that a jury instruction may be challenged on appeal even though no objection was raised at trial (§§ 1259; 1469; *People* v. *Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203]), an objection to a cautionary instruction has been required before the defendant may assert error on appeal because a defendant 'may not sit silently during the course of his trial; create a situation which may be to his advantage or disadvantage and require the court to make an election on his behalf without being bound by that election.' (*People* v. *Miller* (1960) 185 Cal.App.2d 59, 84 [8 Cal.Rptr. 91]; see also *People* v. *Flanders* (1979) 89 Cal.App.3d 634, 640 [152 Cal.Rptr. 696].)" (*People* v. *Toro* (1989) 47 Cal.3d 966, 975 [254 Cal.Rptr. 811, 766 P.2d 577].)

In accordance with *Miller* and *Toro*, we hold that it was incumbent upon appellant to object to the cautionary instruction (CALJIC No. 3.18) in the trial court in order to claim error on appeal.[4]

3. *Appellant contends the trial court erred in refusing to give voluntary manslaughter instructions.*

■ Appellant asserts voluntary manslaughter instructions are required when there is *any* evidence of honest but unreasonable self-defense. (*People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) He contends the trial court erred in refusing such instructions because there was such evidence, regardless of how weak. Appellant is mistaken in both parts of his argument.

*People* v. *Flannel* explicitly disapproved the "any evidence" test for jury instructions. It stated: "Many cases cite, often without elaboration, language in *Carmen, supra,* 36 Cal.2d 768, or in *People* v. *Modesto* (1963) 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33], to the effect that jury instructions must be given whenever *any* evidence is presented, no matter how weak. To

---

[4]Had there been error, it would have been harmless. (See *People* v. *Graham, supra,* 83 Cal.App.3d pp. 744-745 and fn. 6.)

the extent that a decision of any court interprets these cases to require instructions without evidence substantial enough to merit consideration, it is disapproved." (*People* v. *Flannel, supra,* 25 Cal.3d 668, 684-685, fn. 12.) Since *Flannel,* our Supreme Court has consistently held "[a] trial court need only give those requested instructions supported by evidence that is substantial." (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].)

The "any evidence" relied upon by appellant consists of this testimony by Gallardo:

"[Defense counsel] Q. Now, I have a real serious question for you.

"Why is it that you fired at Dreamer, who apparently did nothing to you either?

"What made you fire at him?

"A.   When I was on top of the window sill, I saw him move his right hand in an upper motion, and that's when I started to fire.

"Q.   What did you think he was going to do?

"A.   Shoot at me.

"Q.   Did you see something in his hand?

"A.   I couldn't see. It was too far.

"Q.   I can't hear you. What?

"A.   It was too far.

"Q.   But he moved his hand?

"A.   Yes.

"Q.   Did you ever tell the police that?

"A.   No."

This testimony did not amount to substantial evidence requiring voluntary manslaughter instructions because there was undisputed evidence of the

following: (1) appellant and Gallardo were "looking" for Dreamer (the victim); (2) *before* any hand movement by the victim, Gallardo had crawled half out of the window, sat on the sill, and over the roof pointed the rifle at the victim and shouted "Fuck 36th"; (3) when Gallardo first shot the victim, the victim "took a step forward, and [his] hand, right hand went like in an upper motion *when I pulled the trigger*" (italics added); (4) the first, nonfatal shot struck the victim in the leg; the victim fell, clutching his leg and covered himself; and (5) *thereafter,* the fatal shots to the victim's chest and head were fired.

*If* the victim made a hand movement it occurred *after* Gallardo pointed a rifle at him and shouted "Fuck 36th." Under such circumstances the "hand movement" cannot be relied upon for a *Flannel* defense. (See *People v. Jackson, supra,* 28 Cal.3d 264, 305-306; *People v. Williams* (1977) 75 Cal.App.3d 731, 740 [142 Cal.Rptr. 704].) Additionally, Gallardo did *not* claim he acted in fear when—after the victim had fallen, was clutching his leg, and trying to cover himself—he fired the two fatal shots.

The trial court properly refused voluntary manslaughter instructions.

4. *Appellant contends the trial court erred in refusing to instruct the jury to view with caution his oral admissions.*

A trial court must instruct a jury to view with caution evidence of an oral admission. (*People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 94 [270 Cal.Rptr. 817, 793 P.2d 23].) But the instruction should not be given if the oral admission was tape-recorded. (*People v. Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398], overruled on other grounds by *People v. Murtishaw* (1981) 29 Cal.3d 733, 774-775, fn. 40 [175 Cal.Rptr. 738, 631 P.2d 446].)

Appellant's statements to the investigating officers, made during an approximately one-hour interview, were tape-recorded and admitted into evidence. Accordingly, they were not subject to a "view with caution" instruction.

But appellant contends there was other, non-tape-recorded, evidence of his admissions which required the "view with caution" instructions (CALJIC Nos. 2.70, 2.71). Two statements are cited: "Let's do a drive-by" and "We just shot Dreamer."

Assuming these statements required a "view with caution" instruction[5] we find the omission harmless. As to the first statement ("Let's do a drive-by") the evidence was contradictory and equivocal concerning *who* made the statement. Gallardo first testified "someone" made the statement and later testified *he*, not appellant, made the statement. Gerardo Zambrano testified "they" (appellant, Gallardo, Farias, and Bird) made the statement. Moreover, appellant conceded that others said they wanted to go to 36th (enemy territory) and he knew Gallardo had the rifle but he accompanied them anyhow.

As to the second statement ("We just shot Dreamer"), appellant conceded he told people "Dreamer was shot" but denied saying "*We* shot Dreamer." It is unlikely, even if they believed he made the statement, the jury would have attributed much significance to it. Alone, it conveyed little more than that he, Farias, and Gallardo were together in a car when one of them (Gallardo) shot Dreamer. It was appellant's *pre*shooting statements and conduct that inculpated him.

Moreover, " 'The omission . . . does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error.' . . . Especially in view of the fact that, in substance, the jurors were properly instructed as to how they should treat the testimony of an accomplice, a more favorable result was not reasonably probable here absent the error." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1315 [248 Cal.Rptr. 834, 756 P.2d 221] [citation omitted]; *People* v. *Stankewitz, supra,* 51 Cal.3d 72, 94.)

*5. Appellant contends the trial court abused its discretion in not committing him to the Youth Authority.*

█ Following an evaluation by the Youth Authority (Welf. & Inst. Code, § 707.2) the trial court (Superior Court Judge Cecil J. Mills) rejected the commitment to Youth Authority recommendation and sentenced appellant to state prison, although to be housed at the Youth Authority (Welf. & Inst. Code, § 1731.5, subd. (c)). Appellant contends the trial court abused its discretion in not committing him to the Youth Authority. Appellant is mistaken.

"Where, as here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not

---

[5]The tape recording of appellant's statements to the investigating officers was not transcribed, nor played during trial, nor reported. Although admitted into evidence (exhibit A) the record on appeal does not reflect whether or not the jury, during deliberations, played the tape (they did inquire about it). The tape has not been included as part of the record on appeal.

be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People* v. *Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79], original italics.)

There was no "manifest miscarriage of justice." The sentencing court expressly and carefully considered the Youth Authority report and its recommendation and the statutory considerations[6] for its sentence. We find no error. (See *People* v. *Jones* (1988) 46 Cal.3d 585, 600-603 [250 Cal.Rptr. 635, 758 P.2d 1165]; *People* v. *Prothro* (1989) 215 Cal.App.3d 166, 169-172 [263 Cal.Rptr. 433].)

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 1994.

---

[6]In pertinent part, Welfare and Institutions Code section 707.2 reads: "The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor."