[No. B087667. Second Dist., Div. Seven. Nov. 20, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLTON WILLIAMS, Defendant and Appellant.

450

COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Sanjay T. Kumar and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WOODS, (Fred), J.—A jury convicted Carlton Williams (appellant) of first degree murder (Pen. Code[1] § 187; count I) and second degree murder (§ 187; count II), and found true allegations appellant had personally used a firearm (§ 12022.5) and that the offenses constituted a special circumstance (§ 190.2, subd. (a)(3)). At a penalty trial, the jury recommended life without the possibility of parole.

Appellant contends: (1) the trial court erred in refusing voluntary manslaughter instructions regarding count I; (2) this court should reduce count I to second degree murder; (3) his life without possibility of parole sentence is unconstitutionally disproportionate; (4) section 667, subdivisions (b)-(i) eliminated special circumstance statutes (§ 190.2); and (5) the abstract of judgment contains a custody credits clerical error.

We find merit only in appellant's last contention, correct the clerical error, and, as corrected, affirm the judgment.

FACTUAL BACKGROUND

Despite the seriousness of the charges, the evidence is largely undisputed. Kiyana Cofield, the eight-year-old daughter of one of the victims, and

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

appellant both testified he shot Gidget Jacobs and her sister Kimberly Cofield in the head while they were on the floor bound hand, foot, and mouth.

The background facts may be stated simply.

In the spring of 1992 appellant, Tracie Lockridge,[2] and their three young children lived in a South Los Angeles apartment. In the bedroom closet they had a safe where they kept important papers, rent money, and savings for their planned June 8 wedding. Among the few people who knew about the safe was appellant's lifelong friend, Renoral Jacobs.[3] Two of Renoral's sisters, Gidget Jacobs and Kimberly Cofield, also friends of appellant, lived together at 4191 Buckingham, apartment A, in Los Angeles.

On a Tuesday in May 1992, after appellant had gone to work, Gidget Jacobs and a male confederate forcibly entered appellant's apartment and robbed Tracie Lockridge. The male confederate, who had a gun, knew about the closet safe and forced Ms. Lockridge to open it. Gidget Jacobs tied Ms. Lockridge's hands behind her back with speaker wire. But when the male confederate told her to "stuff" Ms. Lockridge's mouth, Gidget Jacobs refused, saying "She's cool." The robbers left and Ms. Lockridge, still tied, went next door where a neighbor cut her bonds.

Ms. Lockridge did not report the robbery to the police. She returned home, left a message for appellant at work, and attempted to calm her children, especially her traumatized three-year-old son hiding in a closet.

Appellant got the message, came home, and was told about the robbery.

Ms. Lockridge—frightened by the robbery experience and angry at appellant because his friends had robbed her—left with her three children and stayed with her mother for two weeks.

Appellant did not call the police. He called Renoral and Gidget Jacobs. From them, although Gidget Jacobs denied being involved in the robbery, appellant recovered most of the stolen property.[4] Appellant continued to associate with Renoral and Renoral's family. Appellant saw Gidget Jacobs and had a sexual relationship with another of Renoral's sisters, Shelley Jacobs.

Appellant's relationship with Tracie Lockridge, who had returned to their apartment with the children, worsened. She canceled the June 8 wedding and in August she said she and the children were going to leave him.

---

[2] She married appellant sometime after his arrest for these offenses.
[3] The record does not specify his last name, but the last name of two of his sisters is Jacobs.
[4] The record does not indicate what was taken or what was recovered.

On Thursday afternoon, August 20, 1992, appellant left a friend's house and drove toward Gidget Jacobs's apartment. Gidget Jacobs and her sister Kimberly Cofield were outside and when appellant saw them he parked on an adjacent street, took his loaded .38-caliber revolver and gray duct tape, exited, and approached them. He directed them into their apartment.

Eight-year-old Kiyana Cofield and her little brother were in the apartment. She was present when appellant told her aunt, Gidget Jacobs, "You robbed my girl, you bitch." Gidget Jacobs denied it, saying "We didn't rob you on Saturday, Kerry did." Appellant cursed Gidget Jacobs.

Appellant, holding a gun on Gidget Jacobs, gave her strips of duct tape and told her to bind and gag her sister. Gidget bound the hands, feet, and mouth of Kimberly Cofield, who lay on the floor.[5]

Appellant then did the same to Gidget Jacobs.

With both sisters lying on the floor bound and gagged, appellant took a pillow from the couch, put it over Gidget Jacobs's head, placed his revolver against the pillow and shot Gidget Jacobs in the back of her head just above her right ear.

There are two versions of what happened next. Appellant testified: "I spun around. I shot Kimberly." Kiyana testified her mother began throwing up after appellant shot Gidget Jacobs, appellant removed her mother's mouth duct tape, gave her water, re-taped her mouth, and shot her in the temple.

After the shootings, appellant left by the back door.

Kiyana went outside and asked a friend to call the police.

The police arrived, investigated, identified appellant's fingerprints on the duct tape, and arrested him in his apartment a week later. Appellant at first denied involvement, then admitted he was present but said someone else shot the victims, and finally admitted binding the victims to "scare" them and shooting Gidget Jacobs when "the gun went off" and spinning around and shooting Kimberly Cofield.

---

[5]Kiyana, who watched from the hallway, testified appellant bound each victim, Gidget Jacobs first.

## Discussion

1.  *Appellant contends the trial court erred in refusing voluntary manslaughter instructions regarding the death of Kimberly Cofield.*

As to the death of Gidget Jacobs, the trial court gave first degree murder, second degree murder, and voluntary manslaughter instructions. But as to the death of Kimberly Cofield, the trial court refused to give voluntary manslaughter instructions. Appellant contends evidence of heat of passion also required voluntary manslaughter instructions concerning Kimberly Cofield's death. We disagree.

The heat of passion evidence appellant relies upon is his testimony[6] that he "was talking to Gidget, and we were arguing; and *one of them* said we didn't rob you on Saturday, Kerry did." When his lawyer asked "And now do you recall who it was, whether it was [ ] Kimberly or Gidget that said that, or you're not sure" appellant answered "I'm not sure."

According to appellant, this statement ("We didn't rob you on Saturday, Kerry[7] did") did not refer to the May robbery, three months ago, because that was on a Tuesday. Nor did it refer to some past Saturday robbery. Rather, appellant testified, to him the statement meant the declarant (either Gidget or Kimberly) *intended* to rob him on Saturday.[8]

It is this statement which constitutes the claimed provocation causing appellant's heat of passion toward Kimberly Cofield.

"Heat of passion" has been defined as " 'such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . .' " (*People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]. See also *People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149]; CALJIC No. 8.42 (1991 rev.).)

"Heat of passion may not be based upon revenge." (*People* v. *Burnett* (1993) 12 Cal.App.4th 469, 478 [15 Cal.Rptr.2d 638]. See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1112 [248 Cal.Rptr. 510, 755 P.2d 960].) Nor may it be based upon "such predictable conduct by a resisting victim" who awakened during a burglary "and began to scream." (*People* v. *Jackson, supra,* 28

---

[6]Although Kiyana also testified to the same statement, she stated Gidget Jacobs made the statement.

[7]Who "Kerry" was or whether or not appellant knew Kerry was not disclosed.

[8]How appellant arrived at this meaning which converted past tense into future tense and denial into intention was not asked about or explained.

Cal.3d 264, 306.) Moreover, to justify the giving of voluntary manslaughter instructions it is not enough that there is *some* evidence of heat of passion. (*People* v. *Franco* (1994) 24 Cal.App.4th 1528, 1539-1540 [30 Cal.Rptr.2d 478].) There must be "evidence *substantial* enough to merit consideration." (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; accord, *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559] [". . . defendant's vague and unsubstantiated assertion . . . that the Colombian Mafia had threatened to kill him and members of his family if he did not kill the Guerrero brothers" . . . did not constitute substantial evidence of duress]; *People* v. *Jackson, supra*, 28 Cal.3d 264, 305; *In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1180-1181 [270 Cal.Rptr. 286, 791 P.2d 965] [evidence defendant drank 8 to 10 beers and had a blood-alcohol level higher than .14 percent did not constitute substantial evidence of intoxication which might negate specific intent or malice].)

*People* v. *Brooks* (1986) 185 Cal.App.3d 687 [230 Cal.Rptr. 86], relied upon by appellant, is distinguishable. In *Brooks*, there was substantial evidence of a provocation and heat of passion. At 2 p.m. the defendant's brother was stabbed to death in the vicinity of Alamitos and 17th Streets in the City of Long Beach. Defendant "in a very excited, upset state, was running around talking to people, and trying to find out who killed his brother." (*Id.* at p. 691.) At 4 p.m., at the same location where his brother had been stabbed, when defendant found out Thurman Rodd had killed his brother, defendant confronted his brother's killer, yelled, "Where is your knife?" and shot him five times. (*Id.* at p. 690.)

Closer to the instant facts is *People* v. *Spurlin* (1984) 156 Cal.App.3d 119 [202 Cal.Rptr. 663], where the defendant stood by his wife's bed, struck her with a hammer, knotted a tie around her neck, and strangled her. Defendant had been drinking and brooding over his wife's two-year, ever escalating "sexual escapades." (*Id.* at p. 122.) After killing his wife and breaking his hammer in the process, "Spurlin went downstairs to the garage, got another hammer, returned to the bedroom where [his son] was sleeping and killed him with a hammer blow to the head." (*Id.* at p. 123.)

The *Spurlin* trial court gave first degree and second degree murder instructions regarding both killings but voluntary manslaughter instructions only regarding the killing of defendant's wife. The Court of Appeal affirmed the second degree murder conviction of his wife and first degree murder conviction of his son.

As in *Spurlin*, we find no substantial evidence of provocation or heat of passion with respect to the killing of Kimberly Cofield. The trial

court properly refused to instruct on voluntary manslaughter concerning her death.

2. *Appellant contends this court should reduce count I to second degree murder.*

Appellant's first reason we should reduce the first degree murder conviction of Kimberly Cofield to second degree is insufficient evidence of deliberation and premeditation.

Appellant contends the evidence fails to satisfy the *Anderson* (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942]) standard for premeditation. But as our Supreme Court has stated: "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. . . . *Anderson* identifies categories of evidence relevant to premeditation and deliberation that we 'typically' find sufficient to sustain convictions for first degree murder." (*People* v. *Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People* v. *Pride* (1992) 3 Cal.4th 195, 246-247 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

"Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt." (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *People* v. *Ceja* (1993) 4 Cal.4th 1134, 1138-1139 [17 Cal.Rptr.2d 375, 847 P.2d 55].)

The record not only contains substantial evidence of premeditation but satisfies the three *Anderson* factors: planning, motive, and a planned method of killing.

Planning was evidenced by "the fact that defendant brought his loaded gun [with him] and . . . thereafter used it to kill . . ." Kimberly Cofield. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 87 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 240 [253 Cal.Rptr. 55, 763 P.2d 906].) Additionally, he brought duct tape, used to bind and gag both victims, and parked his car on a side street to avoid detection.

Motive was either revenge or a desire to eliminate a witness to his murder of Gidget Jacobs.

There was also evidence of a planned method of killing. Each victim was bound hand, foot, and mouth and then efficiently killed by a single bullet to the head.

■ Appellant's second reason we should reduce the conviction to second degree murder is the claimed confusion caused by the giving of CALJIC No. 8.73 (1992 rev.) which reads: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for such bearing as it may have on whether the defendant killed with or without deliberation and premeditation."

Appellant argues that as to the killing of Kimberly Cofield the jury "received no manslaughter instructions, no instructions on the distinction between murder and manslaughter as the term appears in CALJIC 8.50, no indication of *what* provocation could 'reduce the homicide to manslaughter,' no indication of *why* provocation had any bearing in reducing the degree of the offense, and, most significantly, as to this count, they were not instructed in the crucial language of CALJIC No. 8.42 on the definition of provocation. They were instead told that language, like the language of all the instructions on voluntary manslaughter, was applicable *only to the Jacobs killing*." (Original italics.) We find this contention without merit.

The trial court fully instructed the jury on both degrees of murder, voluntary manslaughter (CALJIC Nos. 8.37, 8.40), heat of passion and provocation (CALJIC No. 8.42), cooling period (CALJIC No. 8.43), murder and manslaughter distinguished (CALJIC No. 8.50), reasonable doubt regarding degree of murder (CALJIC Nos. 8.70, 8.71, 8.72), and evidence of provocation regarding the degree of murder (CALJIC No. 8.73).

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406].)

We are satisfied from a review of all the trial court's instructions that the jury was not confused by CALJIC No. 8.73. Its meaning was plain: *if* the jury believed there was legal provocation regarding the killing of Kimberly Cofield, they "should consider the provocation for such bearing as it may have on whether the defendant killed with or without deliberation and premeditation." (CALJIC No. 8.73 (1992 rev.).)

■ As Chief Justice Rehnquist has observed: "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde* v. *California* (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 329, 110 S.Ct. 1190].)

3. *Appellant contends his life without possibility of parole sentence is unconstitutionally disproportionate.*

■ "Findings of disproportionality have occurred with exquisite rarity in the case law. Because it is the Legislature which determines the appropriate penalty for criminal offenses, defendant must overcome a 'considerable burden' in convincing us his sentence was disproportionate to his level of culpability." (*People* v. *Weddle* (1991) 1 Cal.App.4th 1190, 1196-1197 [2 Cal.Rptr.2d 714].)

"Murder . . . is a serious felony. The intentional killing of another human being is the ultimate expression of violence, particularly . . . where the victim was unarmed." (*People* v. *Eshelman* (1990) 225 Cal.App.3d 1513, 1524 [275 Cal.Rptr. 810].)

Appellant not only intentionally killed *two* unarmed victims but did so while they were helpless: bound hand, foot, and mouth. As to one of those victims the killing was deliberate and premeditated. For such crimes the Legislature has authorized a sentence of death. We find nothing disproportionate in a sentence of life without parole.

4. *Appellant contends section 667, subdivisions (b)-(i) eliminated special circumstance statutes.*

■ Appellant contends the March 7, 1994, "three strikes" statute superseded death penalty and special circumstance statutes. (§§ 190, 190.2.) The contention relies on section 667, subdivision (c) which states, "Notwithstanding any other law . . ." and subdivision (e) which prescribes punishment for defendants with one or more qualifying prior felony convictions. The prescribed punishments include neither death nor life without parole. Although he does not have a qualifying prior, appellant argues equal protection requires application of section 667, subdivisions (b)-(i) to him. The contention does not bear scrutiny.

In enacting section 667, subdivisions (b)-(i), the Legislature declared their purpose: "to ensure longer prison sentences and greater punishment for those

who commit a felony and have been previously convicted of serious and/or violent felony offenses." (§ 667, subd. (b).)

Insulating capital murderers who have one or more prior felony convictions from a sentence of death or life without parole hardly "ensure[s] longer prison sentences and greater punishment . . . ." (§ 667, subd. (b).)

In construing a statute we must avoid an interpretation " 'that renders related provisions nugatory' " (*People* v. *Ramirez* (1995) 33 Cal.App.4th 559, 563 [39 Cal.Rptr.2d 374]) or " 'would result in absurd consequences which the Legislature did not intend'." (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) " '[A]n intention to legislate by implication is not to be presumed.' " (*In re Christian S.*, *supra*, 7 Cal.4th 768, 776.)

The contention is without merit.

5. *Custody credits clerical error.*

The parties agree the clerk erred in recording ordered custody credits. The trial court ordered 751 actual days' and 375 local conduct days' credit for a total of 1,126 days. The court clerk erroneously recorded 684, 342 and 1,026 days. We shall order this *clerical* error corrected.

### DISPOSITION

The abstract of judgment is ordered corrected to read: 751 (days') actual local time; 375 (days') local conduct credits; 1,126 total days.

As corrected, the judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 22, 1996.