Filed 7/13/15  P. v. Pena CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GILDARDO PENA,<br><br>    Defendant and Appellant. | B255494<br><br>(Los Angeles County<br>Super. Ct. No. PA054142) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Harvey Giss, Judge.  Reversed and remanded in part and affirmed in part.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

The evidence presented by the prosecution allowed the jury in this murder case to consider defendant Gilardo Pena as a senior member of a criminal street gang, who was literally the shot caller of the murder. But there was also evidence that other members were the shot callers. There was no evidence defendant was the actual shooter. There was evidence by which the jury could have considered defendant merely an aider and abettor of an assault that led to an impromptu killing. Because it cannot be determined on appeal whether the jury found defendant guilty of directly aiding and abetting the murder, as opposed to the jury finding defendant guilty based on the murder being the natural and probable consequence of aiding and abetting an assault or an assault with a deadly weapon, we must reverse and remand in accordance with *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).

## PROCEDURAL BACKGROUND

A jury convicted defendant of first degree murder in violation of Penal Code section 187, subdivision (a).[1] The jury found that the murder was committed for the benefit of, or in association with, a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The jury also found that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1), personally and intentionally discharged it within the meaning of section 12022.53, subdivisions (c) and (e)(1), and that this personal and intentional discharge proximately caused death within the meaning of section 12022.53, subdivisions (d) and (e)(1).

The trial court sentenced defendant to prison for a term of 50 years to life. The sentence consisted of 25 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e).

Defendant appeals on the grounds that: (1) the conviction for first degree murder must be reduced to second degree murder; (2) the murder conviction violates due process

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

because there was insufficient evidence of a target offense to support liability under the doctrine of natural and probable consequences; (3) the trial court erred in instructing the jury on the factually unsupported theory of murder as a natural and probable consequence of assault with a firearm; (4) the CALCRIM No. 301 instruction was incorrect and violated due process; (5) the trial court erred in instructing the jury that certain witnesses were accomplices; (6) admission of certain testimonial hearsay statements violated state law and the confrontation clause; (7) the firearm enhancement must be stricken; and (8) the cumulative effect of the errors resulted in a denial of due process.

## FACTS

Defendant, also known as "Shaggy," and three of his fellow Toonerville gang members in Tujunga murdered Donald Nelson in November 2005. The other three gang members were Ivan Samaniego (aka "Gangster"), Carlos Perdomo (aka "Silly"), and Clifton or Christopher Sawyer (aka "Stranger"). The members of the Hispanic Toonerville gang were angry because someone had found and passed around a document accusing a Toonerville gang member, Aaron Stapleton (aka "Huero"), of being a police informant. Defendant and the coperpetrators did not believe the accusation against Stapleton. They were determined to find the persons who had passed around the document. In the driveway of a home where one of these persons was suspected of being, defendant and the other three Toonerville gang members encountered Nelson, who was shot dead after arguing with the four gang members. Defendant remained at large for several years, but Samaniego, Perdomo, and Sawyer were arrested, tried and convicted.[2]

**Prosecution Evidence**

Earl Heim lived in the basement of 10106 Silverton Avenue (the Silverton house) at the corner of Silverton Avenue and Valmont Street on November 6, 2005, the day of the murder. The house was known as a drug house or a "tweaker" house. Heim had

---

[2]     See *People v. Samaniego* (2009) 172 Cal.App.4th 1148.

3

received a copy of a piece of paper from Josh Green with "some guy's name on it." Heim heard the paper came from the front yard of someone named Bonji [3] and had previously testified that Josh Krippner [4] had been spreading the paperwork around and starting rumors. One of the so-called rumors was that Green was saying that Josh Krippner was "snitching people off" and making up lies.

Late in the trial, Josh Krippner testified that he found the piece of paper in Bonji's front yard when the house was being raided. He interpreted the paper as saying Stapleton was telling on Bonji, who was his friend. He gave it to Green. Green made about 90 copies that went all over town. Josh Krippner's and Green's distribution of the paper had caused tension between the Toonerville gang and a local white gang, the Peckerwoods.

Donald Nelson, the murder victim, whose nickname was "Hobbit," was Heim's friend. Nelson was at the Silverton house the day of his murder.

Terri Weitzman was visiting her friend Heim at the Silverton house when she went outside to wake up Michelle Pace, as requested by Heim. (Pace was sleeping in a car.) Weitzman was approached by five men, apparently a mixed group of Mexicans and whites. One of the two closest to her asked her if she knew if Green was there. This man had a pitted face and a piercing on his left eyebrow. When she replied that she did not know him, the man told her that Green's car was across the street. They wanted to enter the home, but she said it was not a good idea and offered to see if he was there. Weitzman found Heim and told him "there was five angry looking cholos downstairs and they were looking for a Green."

Told there were four or five Chicanos outside that wanted to enter the house, Heim stepped out the back door to see what they wanted. He heard six consecutive shots. Heim went to see what happened. He saw a body in the driveway and heard Nelson say

---

[3]     Police knew Bonji as Lorin Bongiovanni.

[4]     We refer to Josh Krippner by his full name, since another person named Krippner and another named Josh were witnesses.

"Help me, I've been shot." Pace screamed Nelson's name and knelt beside him. No one else was there, and Heim saw no cars. He asked the owner of the house to call 911.

Weitzman testified that "TVR" stood for Toonerville and "SFV" for San Fernando Valley. She stated, "If SFV is a gang, then [Nelson] was associated with some of them." A few of them lived on Nelson's property. She also recalled that some Peckerwood gang members lived on Nelson's property.

Detective Travis Coyle testified as an expert in narcotics. He had known Nelson before the shooting. When he died, Nelson had a baggie of meth in his mouth, which is a common form of transportation of narcotics. Detective Coyle recalled getting the piece of paper in People's exhibit 1 from Heim on the day of Nelson's death. Detective Coyle knew defendant to live in the Tujunga area.

Green testified that he knew Sawyer and that Sawyer was in the Toonerville gang. He acknowledged that the Peckerwood gang was a white gang, but he was not sure if any of his white friends were in the gang. In a prior proceeding, he testified that Sawyer mentioned something about paperwork involving a white guy and a Hispanic guy. Green testified that he remembered hearing something about Josh Krippner running around with a piece of paper in 2005. He only remembered discussing the paperwork with Sawyer. Green's testimony and inability to recall were impeached continually with his testimony in another proceeding in 2007 and other prior statements. Portions of that testimony were read aloud in court.

Carlos Perdomo, who had previously been convicted of Nelson's murder, was called to the stand but was not a cooperative witness. He said his conviction for the murder of Nelson was "bullshit." He admitted knowing Samaniego, Sawyer, and a woman named Harvey. On cross-examination, he denied telling Samaniego to "smoke" Nelson when he was with Harvey, Samaniego, Sawyer, and defendant on November 6, 2005. Perdomo said he was not present at the murder scene.

Samaniego was also brought out of custody to testify. He stated he wanted nothing to do with the case. He refused to answer any questions. Stapleton refused to be

5

sworn in as a witness. He said he was a "mainline Sureno and . . . would like to go back to [his] prison cell." He refused to answer any questions.

Ashley Harvey was a methamphetamine user in 2005, but she was not in a gang. She was in an intimate relationship with Sawyer, who was in Toonerville. She also had an intimate relationship with Perdomo and knew "Gangster" (Samaniego) of Toonerville. Harvey drove a white van and often gave them rides. Weitzman recalled seeing a van outside the Silverton house just before the murder. Harvey also knew defendant, who was known as Shaggy. She testified at the trial of Sawyer, Samaniego, and Perdomo in 2007 under a grant of leniency. She was not tried for any crime against Nelson and pleaded to a voluntary manslaughter charge in another murder case where the victim was Mike Palada. Harvey knew the Mountair apartments as a hangout for Toonerville, and the area of Silverton Avenue and Valmont Street as a drug area.. She had known Green since childhood. Harvey also knew Stapleton.

On November 6, 2005, Harvey met with Sawyer, Samaniego, Perdomo, and defendant at a house on Glory Avenue and then drove them to the Mountair apartments. At the apartments, the men got out and she waited in the van for 20 minutes. She then drove the men to Silverton Avenue and Valmont Street and waited. She knew they were going to the "tweaker house" to see if Green was there. She had heard something about paperwork and Green. After five to 10 minutes, she heard gunshots, and the men immediately thereafter got back in her van. They told her to drive and appeared hurried, and she drove them to the house on Glory Avenue. She then drove defendant home with Samaniego and dropped off both of them. She later that night saw Perdomo with a revolver. She heard the reason for the gunshots had something to do with Green. She thought he was switching sides between Toonerville and Peckerwood. Harvey was in the presence of these four gang members on multiple occasions and stated that Samaniego would call the shots if something was to be done. She later acknowledged that defendant was not often with them.

Sawyer was convicted of murdering Nelson and Palada and was incarcerated at the time of trial. He was a member of Toonerville. According to Sawyer, Harvey was never

6

his girlfriend—only a sexual partner. He identified a photograph of Harvey's white van and said he might have been in it on the day of Nelson's murder. Before the murder he had heard a little bit about some paperwork that people were talking about. He acknowledged that paperwork in the gang context meant someone was snitching, and anything violent could happen to that person. He had known Green since grade school and was a good friend of his. When he was arrested, Sawyer at first did not wish to talk to police but later told Detective Martinez what had occurred as far as he knew.

Sawyer testified that Harvey was driving them on Silverton Avenue and that he asked her to pull over because he thought he saw Green's car. Sawyer testified that the stop was not planned, and they were on their way to the house on Glory Avenue. There had been talk about Stapleton and Green earlier that day at a hangout at the Mountair apartments, but there was no plan to find out "what was up." Sawyer heard that Green knew where the paperwork was on Stapleton and that people were looking for him. Sawyer knew Green could "get himself into wrecks" and wanted to be present when Green was confronted. The paperwork was accusing Toonerville gang member Stapleton of snitching, and Sawyer and his companions wanted to look at the paperwork to verify if Stapleton was a snitch. If true, Stapleton would have been kicked out of Toonerville. If not true, Green would have been dealt with.

Harvey remained in the car, and Sawyer and his companions walked around the corner toward the Silverton house. Nelson popped out of the bushes, acting "crazy" and "belligerent." He was getting in everyone's face. Sawyer saw a woman and asked if Green was there, and she went in the house to look for Green. While he was talking to the woman, he could hear Nelson yelling, and he believed Nelson was high. He went back to where Nelson had been and saw Nelson being pushed down. He was being hovered over by "everybody." Perdomo was telling Samaniego to shoot Nelson. He said, "Smoke him." At first Sawyer testified that it could have been defendant who pushed Nelson down, but Sawyer was not sure. Sawyer then acknowledged telling Detective Martinez that defendant pushed Nelson down. Sawyer later testified that he had a clear memory that it was defendant who pushed Nelson down. When Samaniego

7

pulled out his gun, Sawyer twice told him not to shoot because it was not worth it. Sawyer saw the gun for the first time when Samaniego was aiming at Nelson. Nelson said, "Please don't shoot me." Sawyer walked away, defendant followed him, and about five seconds later, about six shots were fired. Sawyer and defendant ran to the van and were followed by Perdomo and Samaniego. They drove to the house on Glory Avenue.

Sawyer testified that if anyone was calling the shots that day it was probably the person with the gun, i.e., Samaniego. He denied telling detectives that defendant was calling the shots. Sawyer acknowledged that defendant was an older, respected member of the gang. When his memory was refreshed with the transcript of his interview with police, he testified that he had been led by the interviewers. Detective Martinez told him defendant was calling the shots, and Sawyer just agreed with him.[5] Sawyer was played a portion of the interview wherein he said that defendant was the person who was talking about going to look for the paperwork. In another portion of the interview, Sawyer said defendant and Samaniego were the ones upset about Stapleton being called a snitch. Another portion of the interview confirmed that defendant pushed Nelson down. Sawyer told the detective, "Shaggy got all pissed off and shit and just pushed him, bam." Sawyer also stated in the recording that they wanted to speak to Josh Krippner as well as Green. Sawyer testified he would never refuse to commit a crime that an older gang member wanted to commit. Being in the gang was like being in the army.

Sawyer said he had seen Green speaking with Stapleton outside the Mountair apartments earlier in the day on November 6, 2005. The conversation did not appear to be heated. When he, defendant, and the others were talking at the Mountair apartments about Green, the subject of killing Green was not brought up. Although Green could have been beaten when he was found, this was not mentioned either.

---

**5** According to the transcript, Detective Martinez said, "Shaggy calling the shots again? You gotta tell me if you know, man." Sawyer replied, "Yeah." A recording of this portion of the interview was played for the jury. Sawyer replied "yes" after the first question as well, but the detective talked over his answer.

8

Joe Freeman was the father of Julie Malcomb and lived in her house on Glory Avenue. He was frequently visited by Sawyer and Perdomo. One night after November 6, 2005, Malcomb heard her father's dog barking and her father say something like, "You better get it good" or "hide it good." She asked her father what had occurred and he came out of his room and told her to mind her own business. She heard the voices of Sawyer, Perdomo, and someone named Travacio inside her father's room. She later saw Perdomo leave her father's room. She knew her father had a rifle and a handgun and that the handgun was always near the nightstand. She no longer saw the gun after her house was searched on December 21, 2005.

Sawyer testified that he remembered Freeman keeping a .22-caliber revolver on his night stand. Sawyer suspected Samaniego of taking it. It was the gun Samaniego used to kill Nelson. After the murder, Sawyer told Freeman who took his gun and that he would not be getting it back. Sawyer buried Freeman's holster in Malcomb's yard.

Sandy Sawyer,[6] Sawyer's mother, knew of Nelson because he lived in the same town, Tujunga. She testified that Sawyer lived with his father in the Glory Avenue house, as did Perdomo and Samaniego. On the day Nelson was killed, Sandy had gone to the Glory Avenue house, as she often did. Perdomo, Samaniego, and Sawyer were there talking about finding Green or Josh Krippner. Portions of Sandy's interview with Detective Mario Santana on January 8, 2014, were played for the jury. Sandy told the detective she saw "that guy from Glendale" there with a "strap," meaning a gun. She identified a photo of defendant as the person. At trial, she denied ever having seen defendant before.

Lee Thompson, who was brought out of federal custody, was interviewed by police on November 17, 2005, in relation to the Nelson homicide. At trial, he could not remember what he told them. A recording of his interview was played. In the interview, Thompson said that Travis Krippner, Josh Krippner's brother, had a gun despite being a

---

[6]    To avoid confusion, we refer to Sandy Sawyer by her first name.

felon because he believed "they were coming for his brother." At one point, a white van drove up to the house where Thompson was living with Travis Krippner, and Thompson believed it contained Toonerville gang members. Green came to their home twice and wanted to take Josh Krippner to Toonerville to settle the dispute, but Thompson would not let Josh Krippner go alone. Josh Krippner was like Thompson's little brother.

Travis Krippner knew of the Peckerwoods as a gang of white people. His brother Josh was labeled a Peckerwood and hung out with them. Bonji was one of Josh Krippner's friends. Josh Krippner and Thompson told Travis about the white van coming by the house. Thompson said it was "a van full of Mexicans" and they were asking for Travis. Travis knew that Green needed to see Josh Krippner and take him to the guy his brother was calling a rat, who was a Hispanic guy from Toonerville named Stapleton. Travis believed his brother was trying to show the paper to everyone, and he believed his brother made photocopies of it. Travis got a firearm for protection.

Detective Santana investigated Nelson's homicide. When Malcomb's house was searched on December 21, 2005, Malcomb told the detective she was concerned that some persons had buried a gun on the side of her home. She showed him the spot. Detective Santana found a buried holster. Sawyer was arrested on that date. On January 8, 2014, Detective Santana interviewed Sandy. She told him that "some guy named Shaggy from Glendale had come down to take care of the situation." She identified a photograph of defendant as Shaggy, and she also identified a photograph of Stapleton.

Detective Jose Martinez responded to the crime scene to investigate Nelson's shooting. There were no casings or firearms. The murder weapon was never found. At the time of that trial, defendant's whereabouts were unknown. He was not taken into custody until seven years had passed.

Sergeant Eric Jones testified as a firearms expert. He stated that the buried holster showed indications that it probably held a single action revolver, such as a Colt. His research showed that the holster was for either a single action .22-caliber Colt or the single action .22-caliber High Standard.

10

Starr Sachs, a former firearms examiner for the LAPD, examined damaged bullets from the Nelson case. The four bullets removed from Nelson's body were .22-caliber long rifle bullets. They can be fired from a revolver, a semiautomatic, or a rifle.

Officer Charles Sean Dinse testified as a gang expert. In 2005, he was assigned to the Foothill Division gang enforcement detail. He monitored the Toonerville, Sun Valley Diablos and Violent Boys criminal street gangs. He described the Toonerville's territory and cliques, each of which had its own rivals. The Dukes clique in Tujunga was not a predominately Hispanic gang. One of its primary activities was drawing graffiti, including felony vandalism, and another was illegal narcotics sales. The Toonerville gang was investigated for committing attempted murder and murder, attempted robbery and robbery, carjacking, kidnapping, gun possession, narcotics sales, grand theft auto, and a number of other crimes. Officer Dinse knew defendant as a member of the Dukes clique of Toonerville, and his nickname was "Shaggy." Officer Dinse testified regarding predicate crimes committed by Toonerville members.

Officer Dinse explained that gang members go out on gang missions to perform a specific objective. Shot callers in the gang are well respected and often go on missions to perform oversight. Officer Dinse described the gang hierarchy, comparing it to military rankings. He stated that gang members can commit crimes without direction from a shot caller, but there are consequences.

In the early morning hours of November 7, 2005, Officer Dinse was called to Silverton Avenue regarding the investigation of Nelson's homicide, which had occurred at approximately 11:20 p.m. the night before. He encountered Heim, who gave Officer Dinse and Officer Coyle his copy of the paper he had received saying, "I think this has something to do with this paperwork." Heim knew Stapleton, or "Huero," and that he was a member of Toonerville. One of the rumors flying around was that Bonji had recently been arrested and there was paperwork showing that perhaps Stapleton had tipped off the police about Bonji.

Officer Dinse explained that "paperwork" in gang parlance refers to verification that a certain person is involved in something against the gang, such as an act of

11

disloyalty. Toonerville does not tolerate "snitching." The penalty is an automatic death sentence. The penalty for spreading unsubstantiated rumors about someone snitching is the same. When a person is "green-lighted," anyone with access to that person can assault or kill that person. Toonerville, like all Southern California Hispanic or Sureno gangs, answered to the Mexican Mafia. Peckerwood was a white gang in the Tujunga/Sunland area. They had had no problems with Toonerville and the Dukes until shortly before the murder of Nelson. Officer Dinse knew Samaniego, Perdomo, Sawyer, and Stapleton as members of Toonerville.

Officer Dinse identified photographs of defendant's various tattoos. Several factors led him to believe defendant was a shot caller for the Toonerville Dukes clique. Officer Dinse had a contact with defendant where defendant spat at the officer and said, "Don't fuck with me. Do you know who I am? I'm Toonerville, homes." This indicated to Officer Dinse that defendant was some kind of high-ranking member of the gang.

Officer Dinse explained that a mainline Sureno was a gang member not in protective custody but rather in the mainstream of all the Surenos in prison. In the officer's opinion, Stapleton, by claiming to be a mainline Sureno in court, was conveying to defendant, who was a shot caller, that he was dedicated and loyal to the gang.

Officer Dinse identified a photograph of Sean Kidd, who was deceased. Officer Dinse testified that Kidd told him he was at the Mountair apartments in a meeting with a group consisting of Perdomo, Samaniego, Sawyer, and defendant just prior to the Nelson shooting. Harvey was there in a van. Kidd said it appeared to him that defendant was calling the shots. The Mountair apartment house was one of the addresses associated with defendant. Kidd was not at the murder, but he heard the shots. The murder location was approximately seven-tenths of a mile from the Mountair apartments. Officer Dinse testified that Kidd's information was corroborated by Sawyer and Harvey.

From his intelligence gathering, Officer Dinse learned that the Mountair meeting was held for the purpose of going to look for the people who started the "snitch rumor." An arrest warrant for defendant was issued for an address on Quill Avenue in Sunland in December 2005, approximately 30 days after Nelson's murder.

12

When given a hypothetical situation based on evidence presented in this case, Officer Dinse testified that Nelson's shooting was for the benefit of the gang the hypothetical Hispanic men belonged to. Paperwork that identifies someone as a snitch is the utmost disloyalty or disrespect to a gang. The gang, in this case, Toonerville, has to confirm whether the paperwork is true or not. Anyone that is attached or associated with the paperwork and Peckerwood becomes a target. Toonerville must show its authority and control of the neighborhood and clear its name. The violent crime will benefit the gang for years to come. The crime was also committed in association with and at the direction of a criminal street gang.

## DISCUSSION

## I. Conviction of First Degree Murder and Natural and Probable Consequences Theory

### A. *Defendant's Argument*

Defendant contends that, because the only theory of liability for murder put before the jury was that the murder was a natural and probable consequence of defendant's act of aiding and abetting assault or assault with a deadly weapon, he cannot be held liable for first degree murder under *Chiu*, *supra*, 59 Cal.4th 155.

### B. *Conviction Must be Reduced*

We note that defendant insists the prosecutor's only theory of guilt was that of the doctrine of natural and probable consequences. Respondent's reply is that the record clearly shows the jury had to have convicted defendant on a straight aiding and abetting theory of guilt. We believe neither is correct. We conclude, based on the complete record, that under *Chiu*, defendant's conviction must be reduced to that of second degree murder.

In *Chiu*, the California Supreme Court considered for the first time the correct manner of instructing the jury on aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at p. 162.) After analyzing the statutory and doctrinal bases of this theory of culpability, the court reached the conclusion that "the connection between the defendant's culpability

13

and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the . . . public policy concern of deterrence." (*Id*. at pp. 163-166, 166.) The court held that "punishment for *second* degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id*. at p. 166, italics added.)

Chiu's prosecutor presented the jury with two alternate theories of liability for a murder by firearm that occurred during an arranged fight: direct aiding and abetting and aiding and abetting in the target offense (assault or disturbing the peace), the natural and probable consequence of which was murder. (*Chiu*, *supra*, 59 Cal.4th at pp. 159-160.) The jury was instructed on the natural and probable consequences doctrine with CALCRIM No. 403 in the same manner as in the instant case. The trial court in *Chiu* also read CALCRIM No. 520 regarding first or second degree murder with malice aforethought and CALCRIM No. 521 regarding first degree murder. (*Chiu*, at pp. 160-161.) The latter two instructions were also read in the instant case.

The court stated that Chiu's first degree murder conviction had to be reversed unless it could conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) The court could not so conclude beyond a reasonable doubt. (*Id*. at p. 168.) During deliberations, the jury sent out a note asking what to do because it was "'"stuck on Murder I or Murder II"'" due to a holdout juror's belief she could not place the defendant into the shooter's position. (*Id*. at p. 167.) The holdout juror herself told the court that she was bothered by the principle of aiding and abetting and putting an aider and abettor in the shoes of a perpetrator. (*Id*. at p. 168.) The holdout was removed, and the jury deliberated with an alternate juror before finding Chiu guilty of first degree premeditated murder. (*Ibid*.) The Supreme Court believed these circumstances indicated the jury may have been focusing on the natural and probable

14

consequence theory, and the holdout prevented a unanimous verdict based on that theory. (*Ibid.*)

In the instant case, as we have noted, defendant incorrectly asserts that the only theory of liability put to the jury was that of the natural and probable consequences doctrine of defendant aiding and abetting an assault. On the contrary, the jury was instructed with CALCRIM No. 400 on the general principles of aiding and abetting. The instruction informed the jury that defendant could be guilty in two ways, i.e., he may have directly committed the crime as the perpetrator, or he may have aided and abetted a perpetrator who directly committed the crime. CALCRIM No. 401 explained the elements of aiding and abetting a crime. The prosecutor began her argument by discussing at length the aiding and abetting theory. At the beginning of argument, the prosecutor explained to the jury that "there are theories of liability." She continued, "So here's the theory of liability. You can be guilty of a crime if, one, you commit the crime personally or you help, encourage or facilitate the commission of a crime."

Later on in her argument, the prosecutor stated the murder was of the first degree because "[i]t was a willful act that the perpetrator did and that the defendant aided and abetted." In closing, the prosecutor stated, "Any way you look at it, whether it's natural and probable consequence because he was looking for somebody else and this guy just got in the way, or whether he got there, he made him mad and he decided to kill him." Clearly, the prosecutor argued both theories to the jury.

Approximately two hours after deliberations began, the jury sent out a question, i.e., "What is the definition of second degree murder?" The court directed them to CALCRIM No. 520 and No. 521. The jury's only other query was regarding the definition of a principal and if a principal could be any member of the street gang. The court directed the jury to CALCRIM No. 1402, which defined "principal," as well as No. 401 on aiding and abetting and No. 403 on natural and probable consequences. Approximately 30 minutes after resuming deliberations, the jury reached its verdict.

Respondent argues that the record shows the jury could not have based its verdict on the natural and probable consequences theory in light of the instructions they were

given. Respondent points out that the jury was read CALCRIM No. 520 on "First or Second Degree Murder with Malice Aforethought," and the fact that this instruction related only to the theory that defendant was a principal in the murder itself. Respondent further points out that CALCRIM No. 520 informed the jury that the murder was of the second degree unless the People proved beyond a reasonable doubt that it was murder of the first degree as defined in CALCRIM No. 521. Respondent asserts that the trial court's version of CALCRIM No. 521 in this particular case was based solely on the theory of premeditated murder and not on the natural and probable consequences doctrine. Respondent bases this assertion on the fact that CALCRIM No. 521 uses the word "defendant" rather than "perpetrator" as in "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." Respondent points out that the trial court referred the jury to this instruction specifically when the jury queried about the definition of second degree murder.

The use of the word "defendant" in CALCRIM No. 521 cannot support respondent's argument that the jury absolutely did not find defendant guilty under the natural and probable consequences theory. In this case, it was a given that defendant was not the shooter and his culpability was vicarious. Therefore, CALCRIM No. 521 should not have used the word "defendant" instead of "perpetrator," since the instruction is confusing at the very least, if not to say erroneous, when it states, for example, "The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death."

It is true that, unlike in *Chiu*, there was no holdout juror or deadlocked jury in the instant case to furnish a clue as to the theory the jury relied upon. Nevertheless, "[w]hen a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129.) Here, the prosecutor mentioned

16

both theories, and the jury's query provides no clue. On the record before us, we must reverse defendant's conviction for first degree murder because we cannot determine that the jury in fact relied on the direct aiding and abetting theory. In *Chiu*, the Supreme Court stated that the appropriate remedy was to allow the People the choice of accepting a reduction of the offense to second degree murder or retrying the case to seek a first degree murder conviction under a direct aiding and abetting theory. (*Chiu*, at p. 168.) We will follow suit and provide the same remedy.

## II. Sufficiency of the Evidence

### A. Defendant's Argument [7]

Defendant asserts that in order to prove defendant's guilt on the theory of natural and probable consequences, the prosecution had to prove that either Green or Nelson was assaulted and that the assault was accomplished through a joint enterprise, i.e., an aiding and abetting relationship. He argues there was no evidence of an assault on Green, and the proof of the assault on Nelson relied solely on the uncorroborated testimony of Sawyer, an accomplice. Since, according to defendant, there was no valid basis for a finding of first degree murder based on the natural and probable consequences theory, the conviction violates due process.

### B. Relevant Authority

"Section 240—unchanged since its initial enactment in 1872—defines assault as 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.'" (*People v. Williams* (2001) 26 Cal.4th 779, 784.) "Assault 'is not simply an adjunct of some underlying offense [like criminal attempt], but an independent crime statutorily delineated in terms of certain unlawful conduct immediately antecedent to battery.' [Citation.] Unlike criminal attempt where the '"act constituting an attempt to commit a felony may be more remote,"' '"[a]n assault is an act done toward the

---

[7]    Due to defendant's insistence that the theory of natural and probable consequences was the only theory of guilt, all of his arguments are understood to pertain to that theory.

commission of a battery'" and must "'immediately'" precede the battery. [Citation.]" (*Id*. at p. 786.)

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

### C. Proceedings Below

Under the theory of natural and probable consequences, the trial court instructed the jury that, in order to prove defendant guilty of murder, the prosecution had to prove he was guilty of simple assault or assault with a firearm. (CALCRIM No. 403.) The jury was told that if it decided that defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant was guilty of murder. The jury did not have to agree on which of the crimes defendant aided and abetted. (*Ibid*.)

### D. Evidence Sufficient

Defendant discounts Sawyer's testimony, which revealed the circumstances of an assault on Nelson, on the basis that Sawyer was an accomplice, and his testimony was uncorroborated. We conclude there was sufficient corroboration of Sawyer's testimony for a reasonable jury to conclude that defendant participated in an assault and an assault with a firearm upon Nelson. The evidence showed that defendant and his fellow gang members went to the Silverton house in search of Green, as testified to by Sawyer and Weitzman. Sawyer testified that Nelson argued with them. In the midst of the angry words, Sawyer saw defendant push Nelson down, and he saw all of his fellow gang members surrounding Nelson as he lay on the ground. Samaniego drew a gun, and Perdomo was telling Samaniego to smoke Nelson while Nelson begged him not to shoot

18

and Sawyer twice told Samaniego not to shoot.  This act of "ganging up" on Nelson was clearly a joint enterprise.  Samaniego then shot Nelson.

Only a portion of the accomplice's testimony need be corroborated, and the corroborative evidence need not establish every element of the charged offense.  (*People v. Abilez* (2007) 41 Cal.4th 472,  505.)  "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'"  (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)  Corroborating evidence may be entitled to little consideration when standing alone.  (*People v. McDermott* (2002) 28 Cal.4th 946, 986.)  It has been found that evidence of flight or an attempt of the accused to conceal his or her identity or whereabouts supports an inference of consciousness of guilt sufficient to corroborate the testimony of an accomplice.  (*People v. Perry* (1972) 7 Cal.3d 756, 771-772; *People v. Felton* (2004) 122 Cal.App.4th 260, 272; *People v. Hathcock* (1973) 8 Cal.3d 599, 618 [corroborating evidence included testimony that defendant was in the presence of the two victims shortly before their deaths and in possession of the gun later shown to be the murder weapon].)

The jury was properly instructed on the principles of evaluating accomplice testimony.  (CALCRIM Nos. 301, 335.)  The jury was told of the need for independent supporting evidence and that such supporting evidence could be slight and entirely circumstantial.  The jury was also properly instructed that it would not be enough if such evidence merely showed a crime was committed or the circumstances of its commission—it must tend to connect the *defendant* to the commission of the crime.  The supporting evidence here did just that.

Heim testified that Nelson had been in the Silverton house on the day of the shooting.  Weitzman arrived at the house about 15 minutes before the shooting, and Heim sent her out to wake up his friend asleep in a car.  She returned and told him there were "four or five Chicanos out here that want to come into the house."  Heim immediately stepped out the back door and then heard gunshots.

Weitzman testified that Nelson was there that night.  They talked for about 45 minutes and then they looked out a window and saw a van parked across the street.

Nelson said he had to leave and did so. Weitzman went outside and was approached by five men, some of whom were Hispanic and others who seemed to be white. The man who spoke to her asked if Green was there and said Green's car was parked across the street. He had a pitted face, as defendant was shown to have. Weitzman told Heim that the men were "angry looking cholos." Seconds after she went inside the house to ask about Green, she heard four or five shots.

Sandy testified that she saw Perdomo, Samaniego and her son at the Glory Avenue house talking about finding Green or Josh Krippner. The portions of her interview with Detective Santana on January 8, 2014, a few weeks before defendant's trial, also supported Sawyer's testimony. (People's exhibits 135 a, b.) In those portions, Sandy said that Shaggy (defendant) came down from Glendale to take care of a problem with Green and Josh Krippner.[8] He came down to kill someone and "had the strap on him," which she herself saw while at the Glory Avenue house. She corroborated that Sawyer wanted to keep Green from getting killed. Green was telling everyone that Stapleton was a rat. She described defendant as "kind of fat," which corresponds to defendant's photograph (People's exhibits 48, 50). Sandy identified defendant's photograph in a photographic lineup, recalling his "big nose." She was "pretty sure" it was the same day she saw defendant with a gun that Nelson was shot. She knew that Samaniego rather than defendant shot Nelson.

In addition, as the prosecutor pointed out, the bullets used in the shooting were of a small caliber, according to the coroner. The firearms expert testified they were .22-caliber bullets. There were no casings at the scene, and a revolver was stolen by Samaniego from Freeman. Sandy saw defendant with the gun and holster on what she believed was the day of the shooting.

---

[8]      Defendant points out that no one testified that he lived in Glendale. Officer Dinse testified, however, that the head, or "CEO," of Toonerville in November 2005 was "Timothy Magee at Atwater Village."

20

Accordingly, assuming the jury reached its verdict under the theory of natural and probable consequences, there was sufficient evidence of an assault or an assault with a firearm that was aided and abetted by defendant, such that there was no violation of due process.[9]

## III. Alleged Prosecutorial Misconduct and Trial Court Instructional Error

### A. Defendant's Argument

Defendant argues that even if the prosecution's theory that defendant's act of pushing Nelson to the ground supported liability for murder on a theory of natural and probable consequences, it was still error to instruct the jury on assault with a firearm as a target offense. Defendant maintains that this offense could only have been premised on the intended assault on Green, and there was no proof any assault with a firearm took place. Therefore, he argues, the prosecutor had to prove that an assault with a firearm on Green was at least attempted before defendant could be held liable for the foreseeable result to the assault with a firearm.

Defendant also argues it was misconduct for the prosecutor to argue that merely going to the Silverton house with the intent of assaulting Green was enough to make defendant liable for murder as a natural and probable consequence of assault or assault with a deadly weapon. According to defendant, the prosecutor likely misled the jurors into convicting based solely on the intended assault on Green rather than on the pushing of Nelson, and reversal is required.

### B. Relevant Authority

"""[A]n assault is an act done toward the commission of a battery'" and must '"immediately"' precede the battery. [Citation.]" (*People v. Williams*, *supra*, 26 Cal.4th at p. 786.) "[T]he crime of assault has always focused on the nature of the act and not on the perpetrator's specific intent." (*Ibid*.) "[A]ssault is defined in terms of the proximity

---

[9] We do not address respondent's arguments or defendant's counter-arguments regarding conspiracy to commit assault as a target crime, since that theory was not put before the jury.

21

of the assaultive act to the completion of the offense (i.e., battery) and does not include a specific intent to injure because the assaultive act, by its nature, subsumes such an intent to injure." (*Ibid.*; *People v. Bailey* (2012) 54 Cal.4th 740, 750.)

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

### C. *Jury Properly Instructed; No Prosecutorial Misconduct*

The jury was instructed that, in order to prove that an assault with a firearm took place, the People had to show that the defendant, in this case vicariously through the perpetrator, willfully committed an act with a firearm that by its nature would directly and probably result in the application of force to a person, was aware of facts that would lead a reasonable person to realize that the act would directly and probably result in the application of force, and the perpetrator had the present ability to apply force with a firearm. (CALCRIM No. 875.)

We disagree with defendant that "the target assault on Nelson involved only a single push," and that there was no proof any assault with a firearm took place. A reasonable jury could have found that Samaniego committed an assault with a firearm on Nelson, and defendant aided and abetted that offense. According to Sawyer, he could hear Nelson yelling, and Perdomo was telling Samaniego to shoot Nelson. Samaniego pulled out his gun. All of the Toonerville gang members were hovering over Nelson while Perdomo said this and Samaniego held the gun. Nelson begged for his life and

22

Sawyer twice told Samaniego that Nelson was not "worth it."  The prosecutor argued that the jury could "look at it" from the moment Nelson came upon the scene to find the target crimes.  Under these circumstances, it was not error to instruct the jury on the theory of assault with a firearm.  Furthermore, "[i]f a jury reaches a general verdict on more than one factual theory, one or more of which is supported by the evidence and one of which is not, an appellate court will presume, unless the record shows otherwise, the jury acted properly and relied on a supported theory.  [Citation.]  The principle applies here where it is urged that an instruction lacking sufficient factual application was given [citations] and where nothing in the record shows jurors in fact relied on the challenged theory." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 733-734.)

As for the prosecutor's argument, we agree with respondent that defendant forfeited his prosecutorial misconduct argument for failure to make any objection below. In any event, we believe there was no misconduct, and the prosecutor's remarks were harmless under any standard.

Defendant contends the prosecutor told the jury that proof of an assault was unnecessary and *that merely going to the Silverton house with the intent* of beating up Green was enough to make defendant liable for Nelson's murder.  Defendant quotes the prosecutor as saying, "Let's just assume for the sake of argument their intent was to go beat someone up—when a group of gangsters go with a loaded gun to a location to beat someone up, the natural and probable consequences of that is someone not only may get beat up, they may get shot; and if that happens they're guilty of the ultimate consequence, which is the murder that resulted; and in this case the murder that resulted by the killing of Donald Nelson."

In rebuttal argument the prosecutor stated:  "You go into a dark alley at a tweaker house with weapons.  You look for whether it be Josh Krippner or Josh Green or any other Josh you want to think of to either kill, beat up or figure out whether they're lying about somebody snitching, which is the cardinal sin in gangs, and you think that it's not a natural and probable consequence that someone in a tweaker house might jump up and rush you or somebody might jump up and startle you and somebody might get you upset

23

enough to where you push them down and then have your underlings finish the job because that's the job of the shot caller. . . . Not only is it a natural and probable consequence, it is a consequence of going into a location like that armed."

According to defendant, the prosecutor wanted defendant to be held liable based on a "generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct," such as getting to the bottom of the paperwork issue—which is what the court in *People v. Prettyman* (1996) 14 Cal.4th 248, 268, specifically held did not support liability under natural and probable consequences doctrine. Defendant quotes the prosecutor further as follows: "As long as you intend to assault with a firearm, if something else like a murder takes place as a natural and probable consequence of that assault, then you're guilty of murder. You don't have to have the specific intent of the murder, just the specific intents [*sic*] of what you went to do, whether it be simple assault or assault with a firearm; and that's why even though simple assault and assault with a firearm are not charged in this case, you get the instruction of what the elements are for those crimes just so you know that even if they went to do that, the natural and probable consequences of going there armed in a gang unit would be that someone could get hurt or killed as did Donald Nelson." According to defendant, the prosecutor was erroneously arguing in this instance that she did not need to prove that a target crime was committed, and defendant's *mere intent* to commit an assault or his aiding and abetting of nefarious conduct could support liability under the doctrine of natural and probable consequences.

We believe the prosecutor's arguments in the quoted passages appear to be merely pointing out to the jury that defendant and his cohorts were attempting to carry out their plan to assault Green or Josh Krippner, and that the *situation* that ensued and eventually led to the assault was not unforeseeable. The prosecutor stated that the gang members' act of going out looking for Green and Josh Krippner, getting out of the car with one of them carrying a loaded gun, and proceeding up to the Silverton house believing that Green was inside was the beginning of an attempt to, at a minimum, beat him up. It just happened that before they could confront Green, they were confronted by someone

24

else—Nelson—which the prosecutor argued was a foreseeable event. The prosecutor was not referring to the foreseeability of the murder at this point, but rather the circumstances leading to the assault, the commission of which led foreseeably to murder. In the last quoted portion, the prosecutor clearly wished to emphasize that, regardless of the fact that the People wanted defendant to be found guilty of murder, the People did not have to prove that defendant had the specific intent to kill anyone.

With these arguments, the prosecutor was also clearly trying to rebut the gist of defendant's closing argument, i.e., that the shooting was not a foreseeable outgrowth of going to visit Green to ask about a piece of paper but rather an unforeseeable act of a third party, or the negative reaction to Nelson by two men other than defendant. Counsel asserted Nelson's killing was also not foreseeable because it had nothing to do with what happened with paperwork or the workings of the gang. Counsel stated, "Who knew this guy is gonna pop out of the bushes, . . . ? Who knew?"

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye*, *supra*, 18 Cal.4th at p. 970.) A prosecutor's statements must be viewed in light of the argument as a whole and the context in which they were made. (*People v. Lucas* (1995) 12 Cal.4th 415, 475; *People v. Valencia* (2008) 43 Cal.4th 268, 304.) Here, defendant wrongly singles out a few lines out of a lengthy argument to create his contention. (*Valencia*, at p. 304.) Given the instruction telling the jurors that nothing the attorneys say is evidence, we do not believe the jury drew improper inferences from the prosecutor's arguments. Moreover, the greater part of the complained-of remarks by the prosecutor were spoken during rebuttal argument. Considered in context, these remarks were legitimate rebuttal to the gist of the defense argument, quoted *ante*. (See *People v. McDaniel* (1976) 16 Cal.3d 156, 177.)

25

Finally, even assuming prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. (See *People v. Frye*, *supra*, 18 Cal.4th at p. 976*.*) Defendant must show it is reasonably probable he would have obtained a result more favorable in the absence of the misconduct. (*People v. Arias* (1996) 13 Cal.4th 92, 161.) Defendant argues the prosecutor's misconduct must be analyzed under the *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) standard rather than the standard set out in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) because the misconduct lowered the prosecution's burden of proof. He asserts there is every reason to believe some or all of the jurors relied on the prosecutor's erroneous theory and used the intended assault on Green as the sole basis for conviction.

As we have stated, we do not believe the prosecutor was arguing that proof of an assault or attempted assault was unnecessary, and mere intent would suffice. The prosecutor was obliged to explain the rather difficult concept of murder being the natural and probable consequences of defendant's actions when, according to Sawyer, defendant was walking away when Samaniego shot Nelson, and when the gang did not set out to find Nelson, who had nothing to do with the paperwork. Given the evidence of the confrontation between Nelson and the four gang members, Nelson's inflammatory and apparently "disrespectful" remarks toward them, the fact that Samaniego was armed and Perdomo incited him to shoot, defendant's participation as an aider and abettor was clear, and the prosecutor's remarks did not cause the jury to convict him on an erroneous theory. As stated in *People v. Morales* (2001) 25 Cal.4th 34, the reviewing court presumes that the jury relied on the instructions and not the arguments of counsel in reaching its verdict. (*Id*. at p. 47.) The jury members had not been instructed when the arguments of counsel were presented and were subsequently told they could disregard all arguments of counsel. (CALCRIM No. 104.) Defendant has not rebutted the presumption that the jury properly treated the instructions as the guiding law and the prosecutor's arguments as advocacy. (*Morales*, at p. 47; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

## IV. Reading of CALCRIM No. 301

### A. Defendant's Argument

Defendant contends that, since much of Sawyer's and Harvey's testimony helped the defense, CALCRIM No. 301 was read erroneously in this case. The claim is that the instruction misstated the law and imposed a duty on defendant to corroborate favorable testimony from these witnesses. As a result, the instruction violated defendant's right to due process and affected his substantial rights.

### B. Proceedings Below

CALCRIM No. 301 was read as follows: "*Except for the testimony of Clifton Sawyer and Ashley Harvey*, which requires supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (Italics added.)

### C. Relevant Authority

On appeal, we examine a challenged jury instruction in the context of the instructions as a whole, and in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in the way the defendant asserts. (See *People v. Kelly* (1992) 1 Cal.4th 495, 525-526.) We also presume on appeal that jurors are able to understand and correlate all of the instructions given. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148.)

### D. No Instructional Error

In *People v. Guiuan* (1998) 18 Cal.4th 558, accomplices testified for the prosecution but also gave testimony that could have been interpreted as favorable to the defense. The Supreme Court considered the trial court's reading of CALJIC No. 3.18, which instructed the jury to view the testimony of an accomplice with distrust. (*Guiuan*, at p. 560.) The court granted review to determine whether this instruction must be tailored to indicate that it does not apply to any testimony "favorable" to the defendant. The court discussed *People v. Williams* (1988) 45 Cal.3d 1268, which held that "when an accomplice is called by the defendant alone, it is error for the court to instruct the jurors sua sponte that it should view the testimony with distrust," and which "reiterate[d] the

27

long-standing requirement that, when an accomplice is called by both the prosecution and the defendant, the trial court should tailor the instruction to relate only to his testimony on behalf of the prosecution." (*Guiuan*, at p. 567.) The reason for different rules is that, "[a]lthough the testimony of an accomplice on behalf of the prosecution is subject to distrust because such witness has the motive, opportunity, and means to help himself at the defendant's expense, he or she ordinarily has no such motive, opportunity, or means when he testifies on behalf of the defendant." (*Ibid*.) The court in *Guiuan* concluded that whenever an accomplice or a person who might be determined to be an accomplice testifies, the jury should be instructed as follows: "'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. . . .'" (*Id*. at p. 569.)

We disagree with defendant's view of CALCRIM No. 301 and its effect on the jury in his case. The jury was also instructed with CALCRIM No. 335[10] on accomplice testimony and told that it must consider the instructions as a whole. Reasonable jurors would understand that CALCRIM No. 335 explained the reference to Sawyer and Harvey

---

**10** CALCRIM No. 335 was given as follows: "If the crime of murder was committed, then . . . Sawyer and . . . Harvey were accomplices to that crime. You may not convict the defendant of murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: 1. The accomplice's statement or testimony is supported by other evidence that you believe; 2. That supporting evidence is independent of the accomplice's statement or testimony; AND 3. That supporting evidence tends to connect the defendant to the commission of the crimes. Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

28

as exceptions to the general rule that the testimony of one witness is enough to prove a fact. CALCRIM No. 335 tellingly states that the jury may not *convict* defendant based on the statements or testimony of Sawyer and Harvey alone. Furthermore, the instruction told the jury that supporting evidence was required for their testimony, and there was sufficient supporting evidence for the jury to reasonably believe their testimony, if they chose to do so. This was true for all of the testimony, including what defendant deems favorable to him. The instruction further told the jury that "[a]ny statement or testimony of an accomplice that tends to *incriminate* the defendant should be viewed with caution." (Italics added.)

Defendant insists that, since the prosecutor argued that witnesses did not implicate defendant out of fear, the jurors must have interpreted CALCRIM No. 301 as a mandate to be skeptical of accomplice testimony that aided the defense. This is rather far-fetched. The instruction combined with CALCRIM No. 335 clearly refers to incriminating evidence, and the prosecutor argued that the testimony of Sawyer and Harvey could only be used to find the defendant guilty if the testimony was corroborated by other evidence. The evidence that defendant sees as favorable was not mentioned. Moreover, the jury was fully instructed here on the credibility of witnesses generally with CALCRIM No. 105, which gave the jurors several criteria for evaluating testimony by witnesses such as Sawyer and Harvey. The instruction told the jury members that if they thought the witness lied about some things but told the truth about others they could accept the part they believed was true.

"In any event, we will not set aside a judgment on the basis of instructional error unless, after an examination of the entire record, we conclude the error has resulted in a miscarriage of justice. [Citation.] A miscarriage of justice occurs only when it is reasonably probable that the jury would have reached a result more favorable to the appellant absent the error. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277-278.) The evidence defendant deems as favorable was nowhere near exculpatory and not so beneficial as to result in a more favorable verdict for defendant. Therefore, any misdirection of the jury regarding the accomplice status of Sawyer and Harvey did

29

not amount to a denial of due process or a fair trial. The reading of this instruction to the jury when the accomplice is a defense witness—a situation more damaging to a defendant than what defendant claims occurred here—is state law error. (*People v. Terry* (1970) 2 Cal.3d 362, 398-399, overruled on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381; *People v. Hill* (1967) 66 Cal.2d 536, 555-556 (*Hill*).) There was no reversible error.

## V. Disputed Accomplice Status of Sawyer and Harvey

### A. *Defendant's Argument*

Defendant contends the trial court erred in instructing the jury with CALCRIM No. 335 that Sawyer and Harvey were accomplices, which lessened the prosecution's burden and infringed on defendant's ability to present a defense. Sawyer's and Harvey's liability for the murder was a question of fact for the jury.

### B. *Relevant Authority*

As noted, section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "An 'accomplice' is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of the crime." (*People v. Jones* (1967) 254 Cal.App.2d 200, 213.)

Whether a person is an accomplice is a question of fact for the jury unless the evidence and the inferences to be drawn from the evidence are clear and undisputed, in which case the trial court can decide as a matter of law whether a person was or was not an accomplice. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103; *People v. Carrington* (2009) 47 Cal.4th 145, 191; *People v. Williams* (1997) 16 Cal.4th 635, 679.)

"We must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. [Citations.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington*, *supra*, 47 Cal.4th at p. 192.)

## C. No Prejudicial Error

Defendant contends that by instructing the jurors that Sawyer and Harvey were accomplices, the court was imputing their guilt to defendant. (See *Hill, supra,* 66 Cal.2d at p. 555.) In addition, he argues that the instruction indicated that the court believed they testified falsely. (See *People v. Stankewitz* (1990) 51 Cal.3d 72, 91.) According to defendant, the issue of whether they were accomplices was subject to reasonable disagreement.

The evidence and the inferences to be drawn from Sawyer's conviction for Nelson's murder lead to the clear and undisputed fact that he was an accomplice to Nelson's murder *if* there was a murder. Defendant ignores the fact that CALCRIM No. 335 instructs the jury to first decide if the crime of murder was committed. Only then should the jury consider the status of Sawyer and Harvey as accomplices. Thus, the instruction informed the jury that defendant's participation in the crime was hypothetical for its deliberative purposes. The jury was effectively told not to assume that a murder had actually occurred, which essentially lessened any assertion that defendant was an "accomplice" to a crime that may or may not have happened.

Moreover, the jury was instructed that it could not convict defendant of murder based on the testimony of these witnesses, which results in the instruction being beneficial to defendant. It is significant that Sawyer was convicted of, and serving a prison term for, the murder of Nelson. In *People v. Tewksbury* (1976) 15 Cal.3d 953, the court held that merely being prosecuted for a crime does not make one an accomplice until intent is shown. (*Id*. at p. 960.) Since Sawyer was convicted, a finding of intent was necessarily made. Defendant, relying on *Hill*, argues that this fact did not make him an accomplice for purposes of section 1111.

Hill was tried with codefendants Saunders and Madorid. Madorid testified in court, and his testimony "constituted a judicial confession" that implicated Hill and Saunders. (*Hill*, *supra*, 66 Cal.2d at p. 555.) Hill and Saunders complained that the court erred by *not* instructing the jury that the testifying defendant was an accomplice as a matter of law. (*Id*. at p. 554.) The *Hill* court merely stated that, in that case, the trial

court did not err in allowing the jury to decide whether Madorid was an accomplice, even though it appeared that Madorid was an accomplice as a matter of law. (*Id*. at p. 555.) The court stated that omitting accomplice instructions was not error when "the giving of them would unfairly prejudice a codefendant in the eyes of the jury." (*Ibid*.) Thus, *Hill* is distinguishable, in that its holding does not mandate the omission of accomplice instructions absent a jury finding, as defendant would have it. *Hill* merely stands for the proposition that, even when a defendant is an accomplice as a matter of law, the trial court can leave the issue up to the jury. (*Id*. at p. 555.) Moreover, *Hill* is not supportive of defendant's contention because defendant agreed to the reading of the instruction and did not request any modifications.

With respect to Harvey, if her testimony was believed, she was no more than an accessory, and accessories are not accomplices. (*People v. Tewksbury*, *supra*, 15 Cal.3d at p. 960.) The court's inclusion of Harvey in the accomplice instructions did not, however, prejudice defendant. With CALCRIM No. 335, the jury was told that it could use her testimony to *convict* defendant only if it was supported by other evidence that tended to connect defendant to the crime. The jury was also told that any statement or testimony of Harvey's that tended to *incriminate* defendant should be viewed with caution. To the extent Harvey's testimony was exculpatory of defendant, the jury was free to believe or disbelieve it based on the criteria provided in CALCRIM No. 105.

Moreover, any error was harmless under any standard. (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.) Unlike the accomplice in *Hill*, Harvey was not a codefendant in the instant trial, and there was other, independent evidence incriminating defendant. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1063-1068, 1100 [holding *Hill* inapplicable in case where accomplice had pled guilty before testifying against defendant and other, independent evidence strongly implicated defendant].) Therefore, the concerns expressed by the *Hill* court are inapplicable here. And even *Hill* did not hold that instructing the jury that a codefendant was an accomplice as a matter of law was always prejudicial, but rather that it may be prejudicial in some cases. We do not find such circumstances to be present in this case. On the contrary, the instruction

acted for the benefit of defendant and not to his detriment. (See, e.g., *People v. Teitelbaum* (1958) 163 Cal.App.2d 184, 219 [assertion that accomplice instruction invaded the province of the jury was "fanciful"].) Under these circumstances, there was no significant danger that the jury would impute to defendant any guilt attributable to Harvey. (See, e.g., *Bittaker*, at p. 1100.) If Harvey's testimony were believed, it would impute no guilt for the murder to defendant, since she merely drove defendant and the other gang members to the Silverton house, and defendant did not dispute his presence at the scene of Nelson's shooting. In addition, given the evidence linking Harvey to the commission of the offense, her prior relationships with Sawyer and Perdomo, her agreement to testify in exchange for leniency, and her conviction in the Palada murder, the jury would have regarded all of her testimony with the appropriate measure of distrust under the factors they were instructed to consider in CALCRIM No. 105 in any event.

"'"[I]t is the rare case in which [a claimed instructional error] will justify reversal of a criminal conviction when no objection has been made in the trial court."' [Citation.]" (*People v. Franco* (1994) 24 Cal.App.4th 1528, 1538.) Here, the instructions, when considered as a whole, clearly informed the jury that the prosecution bore the burden of proving defendant guilty of the crime beyond a reasonable doubt. The court instructed the jury with numerous standard instructions on the People's burden of proof and on the proper manner of evaluating the evidence. (CALCRIM Nos. 103-105, 220, 224, 226, 400-401.) Moreover, the instructions also conveyed that, simply because the two witnesses were accomplices to the murder did not mean there were sufficient grounds to support defendant's conviction for murder. The instruction of the jury with CALCRIM No. 335 benefitted defendant by informing the jury it could not convict him on Sawyer's and Harvey's testimony alone. It is not reasonable to assume that the jury would focus on the word "accomplice" in one of the numerous instructions, ignore all the remaining instructions, and conclude they had been informed by the court that defendant's guilt had been established. Finally, as we have noted, there was substantial corroborating evidence to support defendant's conviction. (*Hill*, *supra*, 66 Cal.2d at p. 556; *People v. Avila* (2006) 38 Cal.4th 491, 562-563.)

We conclude the trial court did not prejudicially err, and we reject defendant's argument that he suffered a due process violation because the instructions lessened the prosecution's burden of proof or denied him a meaningful opportunity to present a complete defense.

## VI. Admission of Statements of Deceased Witness

### A. *Defendant's Argument*

Defendant contends the trial court erred in overruling hearsay and foundation objections and a confrontation clause objection to statements made by the late Sean Kidd, who testified in the trial of the three coperpetrators of Nelson's murder. According to defendant, the admission of these statements, which were admitted for their truth and provided crucial evidence against defendant, violated state law and the federal Constitution, requiring reversal.

### B. *Proceedings Below*

During his testimony, Officer Dinse referred to defendant as a shot caller in the Toonerville gang. During cross-examination, when defense counsel asked the officer if he had any contacts with defendant in 2003 or 2004, Officer Dinse replied that he was once chasing some gang members and saw that defendant stayed behind at a gang location. Officer Dinse said that defendant did not run "because he's a shot caller." Defense counsel stated, "Tell me a shot that he called, sir. Tell me an order that he gave." Officer Dinse replied, "He gave a number of orders." Defense counsel stated, "Name one." Officer Dinse replied, "I guess you could say the meeting between Clifton Sawyer and Silly Boy Perdomo and Ivan Samaniego—" Defense counsel, amid several objections from the prosecutor, began asking Officer Dinse if he was ever present when defendant gave an order or if he ever heard or saw defendant give an order on a recording device. Officer Dinse eventually replied, "No."

Upon redirect examination, the prosecutor referred to defense counsel's questions and asked the officer if he could name when defendant called shots. Officer Dinse replied, "Yes." When the prosecutor asked, "With respect to what case do you know through your intelligence gathering of the Toonerville gang that Gildardo Pena called a

shot?" Defense counsel objected on hearsay grounds, and the trial court overruled the objection. Officer Dinse answered the question by stating that defendant called the shots in the Nelson murder case.

On recross-examination, defense counsel asked Officer Dinse if he heard defendant say anything in the way of "calling the shot" as to the Donald Nelson murder. Officer Dinse replied that he had heard witnesses and had spoken to someone who told him that defendant did so. When asked the identity of that person, Officer Dinse replied, "Sean Kidd." Defense counsel asked, "What else—did Sean Kidd also tell you—did Sean Kidd also tell you that—oh, we'll save this for later in the trial. Did—Sean Kidd never told you he saw this man order anybody to do anything, did he, sir?" Officer Dinse stated, "Yes, he did." Counsel asked, "What did Sean Kidd tell you he saw this defendant do?" Officer Dinse replied, "Sean Kidd told me that [defendant] hit up Silly Boy [Perdomo] during the meeting in front of 10134 Mountair, asked him who jumped him into the gang. He also told him that you are not allowed to get in the vehicle, advised he couldn't go in the vehicle when they went on their mission." Counsel asked, "Sean Kidd never told you that this gentleman, this defendant, orchestrated that killing, did he sir? Yes or no?" Officer Dinse replied, "No, he was an observer." Counsel asked, "Did he observe what?" Office Dinse stated, "Him calling the shots." Counsel asked again, "Sean Kidd never told you that he heard or saw this individual order the killing of Donald Nelson, correct? . . . Yes or no, sir?" Officer Dinse answered, "No."

On redirect, the prosecutor asked Officer Dinse, "What did Sean Kidd tell you regarding what he saw at Mountair right before Donald Nelson was killed?" Defense counsel objected and asked for a sidebar. In chambers, defense counsel noted that Sean Kidd gave hours of recorded testimony and testified at the trial of the coperpetrators. Counsel stated, "I have no idea to what extent the court is going to allow this." Counsel also asserted there was a Sixth Amendment issue if Kidd's testimony was allowed in to any great extent because counsel had had no opportunity to cross-examine Kidd.

The prosecutor argued that Officer Dinse talked to Sean Kidd and was told that defendant was calling the shots regarding looking for Green and Josh Krippner. The

officer engaged in intelligence gathering and corroborated Kidd's information with Harvey and Sawyer and therefore could testify as a gang expert that he relies on information he received to say defendant is the shot caller in this case. Moreover, counsel opened the door to the hearsay statements and there was ample opportunity for the prosecutor to go into exactly what Kidd said to Officer Dinse that led to the officer's conclusion defendant was the shot caller.

The court replied that the defense had no choice but to open the door. And since Sawyer was going to testify that defendant was a shot caller in the case, the issue was almost moot. The court was "going to allow it to continue." The court told defense counsel, "You can always argue at the end of the case it is hearsay. Kidd is making it up."

Defense counsel argued that the prosecutor's argument was "predicated on something that simply isn't there." Counsel had thoroughly read the transcripts of Kidd's interview, and Kidd merely made a statement that because defendant was older he looked like the shot caller. Counsel denied he had opened the door, since he was obliged to ask the question. When the court replied that "it does open the door," counsel asked "to what extent?" The court stated it had "no clue as to where it could lead." Defense counsel stated that the court had to "put some limits." The court said it could not limit something it knew nothing about, and it did not know what was on Kidd's recordings. Defense counsel briefly summarized Kidd's account of the events preceding the shooting, and the prosecutor disagreed with counsel's summary. The court stated, "My ruling is [it is] coming in at this stage."

The prosecutor resumed her redirect examination by asking Officer Dinse, "You said that you talked to Sean Kidd about the events that transpired just prior to the murder of Donald Nelson; is that correct?" The prosecutor then asked, "With respect to the address on Mountair . . . did Sean Kidd tell you that the defendant was at that address just prior to the murder?" Officer Dinse replied that Kidd referenced that location and said that defendant, Perdomo, Samaniego, Sawyer, Harvey and Sean Kidd were all there. The prosecutor asked, "Now, you told us that based on what Sean Kidd told you, and based

on other witnesses you talked to, it was your determination that Gildardo Pena was the shot caller in the murder of Donald Nelson, correct?" Officer Dinse confirmed that it was. The prosecutor asked what was happening at the Mountair address, and Officer Dinse stated there was a "meeting" there a very short time prior to the shooting of Nelson. Kidd circled defendant's photograph in a photographic lineup and wrote that he "was the one who seemed to be calling the shots." The officer's interviews with Sawyer and Harvey corroborated the intelligence he had gathered from Kidd. Officer Dinse learned from his intelligence gathering that the purpose of the meeting was "to go look for the people who started the snitch rumor."

On recross-examination, defense counsel established that Kidd did not tell Officer Dinse that he heard anyone planning Nelson's death. Kidd described them as "planning something." It was a meeting about paperwork. Counsel also asked if Kidd "simply said, it seemed that this guy Pena was calling the shots." Officer Dinse replied, "Yes. And he also called him Big Honcho."

### C. Relevant Authority

Evidence Code section 1200 provides in pertinent part that: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible."

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court explained that the confrontation clause of the Sixth Amendment of the United States Constitution provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford*, at p. 42.) *Crawford* stated that the confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.)

37

### D. *Evidence Admissible*

We agree with respondent that the evidence of which defendant complains was admissible pursuant to Evidence Code section 356, which creates an exception to the hearsay rule "without labeling it as such." (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 863-864, fn. 13, disapproved on another point in *People v. Kimble* (1988) 44 Cal.3d 480, 496 & fn. 12.) An appellate court "'"review[s] the ruling, not the [trial] court's reasoning and, if the ruling was correct on any ground, [the appellate court] affirm[s]."'" (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162, fn. 14.)

Evidence Code section 356 provides in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

The purpose of Evidence Code section 356 is to allow an opponent to "place in context the isolated statements" that the proponent already offered, and to promote the jury's "understanding" of those isolated statements. (*People v. Harrison* (2005) 35 Cal.4th 208, 239.) "'Evidence Code section 356 permits introduction of statements "on the 'same subject'" or which are necessary for the understanding of the statements already introduced. [Citation.]'" (*Ibid.*) We note that defendant "opened the door" by his cross-examination, and it makes no difference that the prosecutor initially questioned the detective in a limited way regarding how he had learned about defendant calling the shots. (See, e.g., *People v. Harris* (2005) 37 Cal.4th 310, 334; *People v. Rowland* (1992) 4 Cal.4th 238, 261-262.)

In *People v. Wharton* (1991) 53 Cal.3d 522, the court rejected the defendant's argument that the prosecutor improperly asked a detective to recount the brutal details of a murder to which the defendant had confessed. Defense counsel had asked the detective if the defendant had admitted responsibility for that murder. (*Id.* at pp. 591-592, & fn. 19.) Citing Evidence Code section 356, the court ruled that "[b]y eliciting evidence that

defendant had accepted responsibility for the . . . killing, defendant presented evidence from which the jury could infer that his moral culpability for that crime was somewhat reduced. On redirect, the prosecutor was entitled to rebut that inference with evidence of the entire conversation, revealing that defendant's admission of guilt was not an admirable expression of remorse but was instead made under circumstances showing a false and morally objectionable sense of personal justification." (*Wharton*, at pp. 592-593.)

Likewise, in the instant case, it was defense counsel who insisted upon eliciting from Officer Dinse Kidd's name and the content of his statement regarding what he saw defendant do. The apparent purpose was to expose Officer Dinse's testimony about defendant being the shot caller as something the officer invented or exaggerated. We disagree with defendant's assertion that the prosecutor was the proponent of the evidence. The prosecutor never sought to elicit the identity of the person with whom Officer Dinse had confirmed defendant's shot caller status. The prosecutor objected several times when defense counsel first sought to elicit more information after Officer Dinse stated that defendant called the shots in the meeting before Nelson's murder. Counsel called for a sidebar only when the prosecutor attempted to expand on what the defense had elicited regarding Kidd's statements. Moreover, counsel's principal concern appeared to be the extent of what the prosecutor could elicit, and he asked for limits on the questioning rather than an outright prohibition on further questioning.

As stated in *People v. Steele* (2002) 27 Cal.4th 1230, 1248, "We do not believe . . . that a party may ask relevant questions, then, when the other side does not object, prevent all cross-examination (or redirect examination) responding to the same point by successfully asserting that its own question was improper. . . . [T]he matter lies within the discretion of the trial court, which should strive to prevent unfairness to either side when one side presents evidence on a point, then tries to prevent the other side from responding." (*Id*. at p. 1248.) As in *Steele*, the defense questions were "neither irrelevant nor a blunder," and therefore fairness did not demand that the prosecutor be prohibited from asking "the witness questions on the same point despite the failure to

39

object to the defense question." (*Id*. at p. 1249.) The statements elicited by the prosecutor put into context the testimony previously elicited by defense counsel, in which counsel demanded a flat "yes" or "no" answer that left the jury with an impression the officer had been less than truthful. The statements elicited by the prosecutor thus prevented any misunderstanding as to the nature of the information provided by Kidd.

The record shows that the statements at issue here had "'some bearing'" on the statements elicited by defense counsel on cross-examination and fell within the purview of Evidence Code section 356. (*People v. Zapien* (1993) 4 Cal.4th 929, 959.) In any event, even if the statements had been admitted in error, defendant suffered no prejudice in light of the fact that there was no need for him to be found a shot caller in order to find him guilty of Nelson's murder on an aiding and abetting theory or the theory of natural and probable consequences. Also, as the trial court noted, Sawyer's statement that defendant called the shots was heard by the jury. Furthermore, Kidd reportedly said only that it "seemed" defendant was calling the shots. There is no reasonable probability that defendant would have received a more favorable verdict had the statements not been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.) The application of ordinary rules of evidence, as here, does not violate a defendant's right to due process. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) In addition, even if defendant's right to confrontation had been denied by the use of hearsay, the evidence of guilt was so overwhelming that the use of the hearsay would be harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. 18; see *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 652, 661.)

## VII. Foreseeability of Firearm Use Not Put to the Jury

### A. Defendant's Argument

Defendant contends that, consistent with the doctrine of natural and probable consequences, as well as established principles of criminal liability and the Sixth Amendment, the firearm-use allegation under section 12022.53, subdivision (e) requires a jury finding that the principal's firearm use was foreseeable. According to defendant, the

failure to put the issue to the jury resulted in a prejudicial due process and Sixth Amendment violation, and the enhancement must be stricken.

### B. *Jury Finding on Foreseeability of Firearm Use Not Required*

Defendant cites *Apprendi v. New Jersey* (2000) 530 U.S. 466, 494 (*Apprendi*) for the proposition that any fact that increases punishment beyond the allowable statutory maximum is an element of the offense, regardless of whether the Legislature labels it as an enhancement. *Apprendi* applied the Sixth Amendment of the United States Constitution to hold that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be tried to a jury and proved beyond a reasonable doubt. (*Apprendi*, at p. 490.) *Apprendi* was followed in the instant case, since the firearm-use allegation was tried to the jury and proved beyond a reasonable doubt. The jury was instructed that it must first find defendant guilty of murder either under the natural and probable consequences theory or as an aider and abettor of the murder. Given that the jury was instructed that defendant was charged with murder as a natural and probable consequence of assault with a firearm, no further instruction on foreseeability was required. Furthermore, it was only after the jury decided that murder was a natural and probable consequence of the target crimes did it have to determine whether the murder was committed for the benefit of the gang. (CALCRIM No. 1402.) There was no foreseeability requirement for this finding, and defendant does not claim there is one. Once the jury found defendant was an aider and abettor of either an assault or an assault with a firearm committed for the benefit of the gang, the jury was properly instructed it had to then decide (1) if someone who was a principal personally used or discharged a firearm during the commission of the murder, (2) if the principal intended to discharge the firearm, and (3) if the act of discharging the firearm caused great bodily injury or death to another person. Thus, the firearm use was far removed from the natural and probable consequences theory on which defendant grounds his claim.

Under the natural and probable consequence theory, the specific acts need not be foreseeable, only the resulting harm. "'The consequence need not have been a strong

41

probability; a possible consequence that might reasonably have been contemplated is enough. . . . The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind that might result from his act. [Citations.]' [Citation.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 373-374.) Even in the recent case of *Chiu,* the California Supreme Court has stated: "We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense. Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable *foreseeability of the actual resulting harm* or the criminal act that caused that harm. [Citations.]" (*Chiu*, *supra*, 59 Cal.4th at p. 165, fn. omitted, italics added.) Defendant's argument is without merit.

## VIII.  Cumulative Error

Defendant contends that the errors in this case lessened the prosecution's burden of proof and infringed on defendant's ability to challenge the evidence against him or to have the favorable evidence considered by the jury. He argues that the trial was therefore fundamentally unfair and reversal is required.

In examining cumulative error, the critical question is "whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349; accord, *People v. Cain* (1995) 10 Cal.4th 1, 82 [a defendant is entitled to a fair trial, not a perfect one].) A predicate to a claim of cumulative error is a finding of error. Apart from the accomplice instructions on Harvey, which were approved by defendant and were of minimal significance, we have found no error, and we concluded the instructions were not prejudicial. Our review of the record assures us that defendant received due process and a fair trial. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 1006.) Therefore, there was no cumulative error requiring reversal.

## DISPOSITION

The matter is reversed and remanded to allow the People the choice of accepting a reduction of the offense to second degree murder or retrying the case to seek a first

degree murder conviction under a direct aiding and abetting theory.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.